COMPTROLLER OF THE TREASURY *v.* THE
MANDEL, LEE, GOLDSTEIN, BURCH
RE-ELECTION COMMITTEE

[No. 7, September Term, 1977.]

*Decided July 5, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY,
SMITH, DIGGES, LEVINE and ORTH, JJ., and RIDGLEY P. MELVIN,
JR., Associate Judge of the Court of Special Appeals,
specially assigned.

*Gerald Langbaum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Jon F. Oster, Deputy Attorney General,* on the brief, for appellant.

*L. Paige Marvel* and *Marvin J. Garbis,* with whom were *Garbis & Schwait, P.A.* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here hold that organ music presented in connection with a buffet dinner and cocktail party held in 1973 to raise political campaign funds for the Mandel-Lee-Goldstein-Burch reelection effort was not "furnished [as] a performance" within the meaning of Maryland Code (1957, 1969 Repl. Vol., 1972 Cum. Supp.) Art. 81, § 402 (a) and thus that no admission tax is due in connection with this event.[1] Therefore, we shall affirm an order of the Baltimore City Court (Greenfeld, J.) which reversed the order of the tax court.

The statute in question provides in pertinent part:

"(a) *Counties.* — Effective July 1, 1972, any county by resolution may levy a tax on the gross receipts of every person, firm or corporation obtained from sources within the county derived from the amounts charged for (1) admission to any place, whether the admission be by single ticket, season ticket or subscription, including a cover charge for seats or tables at any roof garden, cabaret or other similar place where there is furnished a performance, if payment of the amounts entitles the patron thereof to be present during any portion of the performance; . . . and (4) refreshment, service or merchandise at any roof garden, cabaret or similar place where there is furnished a performance. . . .

---

1. For the politically unsophisticated of later generations we record that Messrs. Mandel, Lee, Goldstein, and Burch were then and now Governor, Lt. Governor, Comptroller of the Treasury, and Attorney General of Maryland, respectively, and that they were anticipating seeking renomination and reelection to those offices.

"The term 'roof garden or other similar place' shall include any room in any hotel, restaurant, hall or other place where music or dancing privileges or other entertainment, except mechanical music, radio or television, alone, and where no dancing is permitted, are afforded the members, guests, or patrons in connection with the serving or selling of food, refreshment or merchandise. . . . The tax levied by this subsection shall be collected by the Comptroller."

Code (1957) Art. 1, § 14 states that the word "county" is to "be construed to include the City of Baltimore, unless such construction would be unreasonable." In this instance § 402 (b) has a provision similar to § 402 (a) applicable to incorporated cities and towns. Baltimore City implemented this admission tax provision when it enacted Ordinance No. 113 on June 29, 1972, amending Baltimore City Code (1966) Art. 28, § 128 A.

The facts are undisputed. In fact, most of them were stipulated. The affair in question was held in the auditorium and exhibition hall of the Baltimore Civic Center on May 22, 1973. The price of tickets was $100 per person. Two organists received a total of $130 for music. Gross receipts were $849,625. A tax in the amount of $82,122.50 was paid. The Comptroller denied a timely request for a refund. The Maryland Tax Court affirmed that decision. The Baltimore City Court reversed the action of the tax court, thus producing the Comptroller's appeal to the Court of Special Appeals. We granted the writ of certiorari prior to a decision by that court.

Tickets for the fund raiser were sold by various politically oriented individuals to their acquaintances. The affair was described on those tickets as a cocktail party and buffet. There was no indication on the tickets or otherwise that any music or entertainment would be presented. The committee sponsoring this event paid for no advertising or publicity in connection with it.

There came a time in the planning of the affair when the

caterer suggested that an organist be procured to supply background music. An expenditure of approximately $100 was then authorized for this purpose. The music was from the organ in the Civic Center which the caterer said was located in a cavity behind the curtain on the stage and could not have been visible to most of the people in attendance. Two organists shared the playing because one had to leave early in the evening. Approximately 7,000 people attended. There were no signs, public announcements, advertising, or any other form of notice to direct the attention of those present to the fact that an organist was playing.

The long-standing policy of the Admissions and Amusement Tax Division of the office of the Comptroller is to collect an admissions tax in a case such as this if there is live music, regarding that as a performance within the meaning of the statute.

As we recently have pointed out in *Supervisor v. Southgate Harbor*, 279 Md. 586, 595-96, 369 A. 2d 1053 (1977), and *Comptroller v. Diebold, Inc.*, 279 Md. 401, 407, 369 A. 2d 77 (1977), judicial review of decisions of the Maryland Tax Court is severely limited. Code (1957, 1975 Repl. Vol., 1976 Cum. Supp.) Art. 81, § 229 (o) provides that on appeal to a circuit court or to the Baltimore City Court the tax court order is to be affirmed "if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record." Otherwise, it may be "affirm[ed], reverse[d], remand[ed], or modif[ied] . . . ."

As we see it, this case is essentially one of statutory construction and a question as to whether the presentation of the music here constituted, as a matter of law, a performance within the meaning of the statute.

Principles relative to statutory construction were summed up for the Court by Chief Judge Murphy in *State v. Fabritz*, 276 Md. 416, 348 A. 2d 275 (1975), *cert. denied*, 425 U. S. 942 (1976):

> "The cardinal rule in the construction of statutes is to effectuate the real and actual intention of the Legislature. *Purifoy v. Merc.-Safe Dep. & Trust,*

273 Md. 58, 327 A. 2d 483 (1974); *Scoville Serv., Inc. v. Comptroller,* 269 Md. 390, 306 A. 2d 534 (1973); *Height v. State,* 225 Md. 251, 170 A. 2d 212 (1961). Equally well settled is the principle that statutes are to be construed reasonably with reference to the purpose to be accomplished, *Walker v. Montgomery County,* 244 Md. 98, 223 A. 2d 181 (1966), and in light of the evils or mischief sought to be remedied, *Mitchell v. State,* 115 Md. 360, 80 A. 2d 1020 (1911); in other words, every statutory enactment must be 'considered in its entirety, and in the context of the purpose underlying [its] enactment,' *Giant of Md. v. State's Attorney,* 267 Md. 501 at 509, 298 A. 2d 427, at 432 (1973). Of course, a statute should be construed according to the ordinary and natural import of its language, since it is the language of the statute which constitutes the primary source for determining the legislative intent. *Grosvenor v. Supervisor of Assess.,* 271 Md. 232, 315 A. 2d 758 (1974); *Height v. State, supra.* Where there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intention of the Legislature. *Purifoy v. Merc.-Safe Deposit & Trust, supra.* Thus, where statutory language is plain and free from ambiguity and expresses a definite and sensible meaning, courts are not at liberty to disregard the natural import of words with a view towards making the statute express an intention which is different from its plain meaning. *Gatewood v. State,* 244 Md. 609, 224 A. 2d 677 (1966). On the other hand, as stated in *Maguire v. State,* 192 Md. 615, 623, 65 A. 2d 299, 302 (1949), '[a]dherence to the meaning of words does not require or permit isolation of words from their context " * * * [since] the meaning of the plainest words in a statute may be controlled by the context. . . ." ' In construing statutes, therefore, results that are unreasonable, illogical or inconsistent with common sense should

be avoided whenever possible consistent with the statutory language, with the real legislative intention prevailing over the intention indicated by the literal meaning. *B. F. Saul Co. v. West End Park,* 250 Md. 707, 246 A. 2d 591 (1968); *Sanza v. Md. Board of Censors,* 245 Md. 319, 226 A. 2d 317 (1967); *Height v. State, supra." Id.* at 421-22.

*See also Harden v. Mass Transit Adm.,* 277 Md. 399, 406-07, 354 A. 2d 817 (1976), and *Pressman v. Barnes,* 209 Md. 544, 558-59, 121 A. 2d 816 (1956). Judge Mitchell said for our predecessors in *Magruder v. Hospelhorn,* 173 Md. 62, 194 A. 839 (1937):

> "[A]s stated in *Gould v. Gould,* 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211: 'In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen.' " *Id.* at 72.

To like effect *see Scoville Serv., Inc. v. Comptroller,* 269 Md. 390, 396, 306 A. 2d 534 (1973); *McConihe v. Comptroller,* 246 Md. 271, 275, 228 A. 2d 432 (1967); *Fair Lanes v. Comptroller,* 239 Md. 157, 162, 210 A. 2d 821 (1965); *Comptroller v. Rockhill, Inc.,* 205 Md. 226, 234, 107 A. 2d 93 (1954); and *Compensation Board v. Albrecht,* 183 Md. 87, 92, 36 A. 2d 666 (1944).

In *Villa Nova v. Comptroller,* 256 Md. 381, 386, 260 A. 2d 307 (1970), Judge Singley said for the Court that this statute "is structured in a fashion strikingly similar to § 1700 (e) (1) of the Internal Revenue Code of 1939, as amended, 26 U.S.C. § 1700 (e) (1), which imposed the federal cabaret tax, since repealed . . . ." Decisions concerning this federal statute are instructive.

In *Deshler Hotel Co. v. Busey,* 36 F. Supp. 392 (S. D. Ohio 1941), *aff'd,* 130 F. 2d 187 (6th Cir. 1942), the controversy

concerned dance music provided during the dinner and late supper hours at a hotel. A space in front of the orchestra platform was cleared of tables so that patrons of the dining room might dance. Frequently, members of the orchestra were featured as instrumental or vocal soloists as a part of the dance music. These soloists always remained on the platform and did not mingle with the patrons. There was no cover, minimum, door charge or special charge made. The only charges were for whatever food, service, or refreshments persons in attendance chose to purchase. The court discussed the requirement of the statute that there be a "public performance for profit." It said:

> "The second requirement of the statute is that the performance in question must have been a public performance. Here again the law is clear and not subject to administrative interpretation. The expression 'public performance' has an ordinary and accepted meaning, readily understandable. The context does not indicate that any other meaning is intended and the term is not defined by the regulation. We may therefore accept the intent of Congress as being that the ordinary meaning of the phrase shall be used. The evidence shows, and the court determines and states as a finding of fact, that the performances in question were 'public performances.' " *Id.* at 396.

It concluded, however, "that the performances in question were not given for profit" and thus that no tax was payable. The court had found four requirements there for imposition of the tax, (1) that a charge must be made for admission which might be wholly or in part included in the price paid for refreshment, service, or merchandise; (2) that it must be a public performance; (3) that the performance must be for profit; and (4) that it must be at a roof garden, cabaret, or other similar entertainment.

In *Avalon Amusement Corporation v. United States*, 165 F. 2d 653 (7th Cir. 1948), the court said:

> "Was the operation of the dance hall under these circumstances 'a public performance for profit?' We

think that it was. A hall in which music for dancing is furnished to any one of the public who is able and willing to pay the admission fee is an establishment furnishing 'a public performance for profit.' The fact that the public participates in the performance by dancing to the music furnished by the plaintiff does not make it any the less a performance; the performance is certainly open to the public, and the plaintiff operates the dance hall for profit. Apparently, one who pays his admission may sit around and watch the dancing without participating therein and be served refreshments. In any event, there is here a public performance for profit." *Id.* at 654.

*Avalon* was cited with approval in *Birmingham v. Geer,* 185 F. 2d 82, 86 (8th Cir. 1950), *cert. denied,* 340 U. S. 951 (1951).

In the context of a statute relative to 'any obscene exhibition or performance" Judge Butzner said for a three-judge court in *Grove Press, Inc. v. Evans,* 306 F. Supp. 1084, 1087 (E. D. Va. 1969), citing Webster's Third New International Dictionary (1964):

"A common meaning of performance is 'a public presentation or exhibition,' and exhibition has been defined as 'a public show or showing; * * * a display or show where the display itself is the chief object and from which the exhibitor derives or expects to derive a profit.' " *Id.* at 1087.

Webster's New International Dictionary (2d ed. 1959) defines "performance" as:

"**2.** An act of performing, esp., of performing in a formal or ceremonious manner or of performing the functions required of one; a deed; feat; esp. one executed in public or in a manner to attract attention; hence, a public entertainment or exhibition of skill; a presentation of a play; as, to attend a *performance.* 'Her walking and other actual *performances.*' *Shak.* 'His musical *performances.*' *Macaulay.*" *Id.* at 1818. (Emphasis in original.)

As to "entertainment" the same work states:

"**3.** That which entertains, or with which one is entertained; as: **a** . . . **b.** That which engages the attention agreeably, amuses, or diverts, whether in private, as by conversation, etc., or in public." *Id.* at 853.

"Exhibition" is defined as:

"**3. a** . . . **b** Any public show; a display, as of works of art, or of feats of skill, or of oratorical or dramatic ability." *Id.* at 893.

We find persuasive the reasoning used with reference to the cabaret tax by the court in *United States v. Broadmoor Hotel Co.*, 30 F. 2d 440 (D. Colo. 1929):

"A fair construction of the language, 'any public performance for profit at any roof garden, cabaret, or other similar entertainment,' imports something more than the furnishing by the hotel of attractive and agreeable surroundings and music by an orchestra generally found in hotels of the type of the Broadmoor. Music has been a common accessory of hotel dining rooms and lobbies, both before and after the enactment of this statute; so, if Congress had intended to cover the situation we are considering, they would have definitely said so. Therefore, how can it be said that the defendant, in addition to running a hotel, is conducting a roof garden, cabaret, or other similar entertainment.

"It is contemplated that the entertainment referred to shall be conducted for profit and admission charged. But it may be assumed from the statement of facts that 75 cents is not an excessive charge for tea; so, where is any admission charge, and where is any direct profit, found?

"This section of the Revenue Act calls for something that might be termed entertainment, as distinguished from the mere service of food in the

manner and with the accessories customary and expected by the patrons of a hotel of the character of the Broadmoor. Otherwise, it would logically follow that every restaurant, that maintains a radio, victrola, or other musical instrument, would come within the provisions of this section. Such was not the intent of Congress." *Id.* at 441.

The tax court said in the course of its opinion, "The uncontradicted evidence was that the organist who performed was not generally visible to those present, and that there were no signs, public announcements or advertising to call attention to the fact that an organist was playing at the Salute."

The piddling nature of the musical presentation here is readily apparent when one notes that it cost $130, that the tax claimed is in excess of $82,000, and the gross receipts were more than $800,000. This was not a musical "performance" as the public thinks of such matters. This was not a recital on the stage, but background music. It is probable that many of those in attendance were not even aware of its existence. Those present were drawn not by the organ music, but by the combination of paying homage to respected political friends; rubbing elbows with political persons and personages; exchanging pleasantries and small talk with good friends and acquaintances; consumption of a certain amount of beverages, alcoholic and otherwise; and the privilege and pleasure of basking in the glory of those dominant in the affairs of the State and its Democratic Party. We are unable to precisely define "performance" in the terms of its meaning in this admission tax statute, nor for purposes of this opinion need we attempt such a definition. Given the ordinary meaning of the word performance, the construction placed on the word by other courts, and the principle as enunciated by the Supreme Court and repeated by this Court on a number of occasions that "[i]n case of doubt [relative to the interpretation of statutes levying taxes] they are construed most strongly against the government, and in favor of the citizen," we need

go no further than to hold as a matter of law that playing a little bit of organ music behind a curtain under the circumstances of this case does not constitute a performance. Thus, no tax was due.

*Judgment affirmed; appellant to pay the costs.*