PRINCE GEORGE'S COUNTY, MARYLAND ET AL. *v.*
STATE OF MARYLAND COMMISSION ON
HUMAN RELATIONS

[No. 264, September Term, 1978.]

*Decided October 16, 1978.*

The cause was argued before GILBERT, C. J., and MOYLAN
and DAVIDSON, JJ.

*David S. Bliden, Associate County Attorney,* with whom were *James C. Chapin, County Attorney, Michael O. Connaughton, Deputy County Attorney,* and *John R. Gober, Associate County Attorney,* on the brief, for appellants.

*Risselle Rosenthal Fleisher, General Counsel,* for appellee.

GILBERT, C. J., delivered the opinion of the Court.

We herein hold that the State of Maryland Commission on Human Relations (Commission) does not possess the authority to subpoena certain records pertaining to arrests made by the Prince George's County Police Department (Department). Accordingly, we reverse the judgment of the Circuit Court for Prince George's County.

Before we explain why we have concluded that the Commission lacks the power to subpoena records of the Department relative to charges of "police brutality," we shall briefly recount the factual situation from which this matter arose.

## THE FACTS

Following receipt of citizens' complaints of acts of brutality supposedly committed by personnel of the Department, the Commission undertook to survey the situation. In order to ascertain the facts surrounding the incidents that led to complaints having been filed with the Commission against the Department, an Intergroup Relations Representative [1] visited the Department on July 8, 1976. A verbal request was made by the Commission's investigator for data pertinent to the survey. The Department offered to supply only the names of the officers allegedly involved and to afford the Commission investigator an opportunity to interview those officers. The Department declined to furnish any information over and above the names and opportunity for an interview. Subsequent written requests made by the Commission to the

1. The designation assigned to the Commission's staff investigators by the Maryland State Department of Personnel.

Department were rejected. The Commission refused to be blocked by what it apparently believed to be the Department's wall of non-cooperation, and it served upon the Chief of the Police Department a *subpoena duces tecum* signed by the Commission's then Chairman.

The subpoena "directed" the Chief to deliver to the Commission thirteen (13) specifically enumerated items.[2] Delivery was to be made at the Commission's Mondawmin Mall office in Baltimore City before noon, September 3, 1976. That deadline passed without the Department's having complied. For almost a year the matter seemingly lay dormant.[3] Finally, on August 26, 1977, the Commission filed a petition in the circuit court for an order directing the Department and the Chief to provide the "documents referred to in the *subpoena duces tecum* issued August 25, 1976. . . ." The Department and the Chief demurred to the petition, and before the demurrer was heard, the Commission moved for summary judgment.

The demurrer and motion were heard before the circuit court which, in a written "Opinion and Order of Court," overruled the demurrer of the Department and the Chief. Thirteen (13) days later, the court granted the Commission's motion for summary judgment, entered judgment against the Department and the Chief, and ordered the Chief to deliver the subpoenaed material to the Commission. The Department and the Chief appealed. Because the case would have been mooted by compliance with the circuit court's order, we granted a stay of that order pending disposition on the merits by this Court.

## THE LAW

By Laws 1951, ch. 548, codified as Md. Ann. Code art. 49B,

---

2. Among the items sought were five (5) arrest reports, department records relative to those arrests, all Internal Investigation Division's written reports concerning arrests on April 11, 1976, the names of witnesses, photographs of the arrestees as well as the scene, official statements made by arresting officers, records of all radio communications regarding the incident of April 11, 1976, as well as other relevant data.

3. At least the record fails to disclose any contact between the parties during that period of time.

titled "Interracial Commission" [4] was amended. Section 3 of ch. 548 provided that:

"The ... Commission shall have authority and power to make such surveys and studies concerning interracial relations, conditions and problems as it may determine [5] to promote in every way possible the welfare of the colored race and [6] the betterment of interracial relations. ...

"It shall be the duty of said Commission to submit an annual report to the Governor and General Assembly on or before January 1st each year, setting forth the results of its studies and recommendations, if any, for any additional legislation."

In 1968, Md. Ann. Code art. 49B, §§ 1, 3 and 12 were repealed and reenacted with amendments. The Commission name was changed to "Human Relations Commission." Section 3 was changed by striking wherever it appeared the word "interracial" and substituting in lieu thereof the word "human." Laws 1968, ch. 83. Notwithstanding chapter 83, the same session of the Legislature enacted chapter 464, approved by the then Governor, a month after chapter 83 had been signed into law. Chapter 464 amended section 3. The amendment made no reference to "Human" but referred to the "Interracial Commission" and "interracial relations."

The 1969 General Assembly attempted to clear up the legislative haze. The "Human Relations Commission" was established, and its powers and duties were enumerated. Oddly, however, Laws 1969, ch. 153, § 3 (A) continued to refer to "interracial relations," while Md. Ann. Code art. 49B, § 3

---

4. The Commission was subtitled "Commission to Study Problems Affecting the Colored Population." Laws 1951, ch. 548, § 1.

5. Laws 1960, ch. 100, § 2 changed the subtitle to "Commission on Interracial Problems and Relations." Section 1 of Laws 1960, ch. 100 inserted a comma as well as the conjunction "and" after the word "determine" and before the preposition "to." The text then read "as it may determine, and to promote in every way, etc."

6. The phrase "the welfare of the colored race and" was deleted from the statute. *Ibid.*

(a) used the terminology "human relations." Since it is the Session Laws that govern, the discrepancy continued until the 1977 revision.

The 1977 legislative session amended section 3 of Md. Ann. Code art. 49B. That section, at the time the matter was heard in the circuit court, provided in pertinent part:

> "(a) The Commission may make such surveys and studies concerning human relations, conditions and problems as it may determine, *and to promote in every way possible the betterment of human relations.* In making studies and surveys, it may expend any funds provided for in the budget or otherwise made available.
>
> On the basis of studies or surveys, the Commission may recommend to the Governor [7] additional legislation or changes in existing legislation.
>
> . . . .
>
> (c) Whenever any problem of racial discrimination arises, the Commission immediately may hold an investigatory hearing. The place of any hearing shall be in the area where the problem exists.
>
> The purpose of the hearing shall be to resolve the problem promptly by the gathering of all the facts from all the interested parties and making such recommendations as may be necessary." (Emphasis supplied.)

That statute goes on to prohibit discrimination in public accommodations, section 11; declaring it to be unlawful to receive renumeration for participating in racial demonstrations, section 11A; mandating that agencies, offices, and employees of the State may not engage in discriminatory practices, section 11B; proscribing discrimination by any person, firm, or corporation licensed or regulated by the Department of Licensing and Regulation, section 11C; specifying the enforcement powers of the Commission,

---

7. The previous direction to the Commission that it also recommend additional legislation to the General Assembly was dropped by Laws 1969, ch. 153, § 3.

including investigations, hearings, and enforcement, sections 12-15; establishing the confidential nature of the investigation, section 16; prohibiting discrimination in employment, section 17; defining the terms as used in the subtitle, section 18; enumerating unlawful employment practices, section 19; mandating that pregnancies or child birth are to be treated as temporary disabilities, section 19A; exempting from the employment provisions certain religious corporations and associations, educational institutions, and others, section 20; banning discrimination in housing, section 21; setting out those practices it deems unlawfully discriminatory in housing, section 22; prohibiting "block busting," section 22A; precluding discrimination on the basis of race, creed, marital status, sex, national origin, incapacity, or the like by banks, savings and loan institutions, credit unions, insurance companies, and others engaging in making mortgages or loans for the purchase or improvement of dwellings, section 23.[8]

The authority conferred on the Commission by the phrase "and to promote in every way possible the betterment of human relations," as italicized in the quotation from section 3 above, appears to be all encompassing so long as the Commission determines that its study or survey concerns human relations. Nevertheless, the phrase may not be lifted out of the statute so as to confer upon the Commission powers never granted to it by the Legislature. The statute must be read as a whole. *State v. Fabritz,* 276 Md. 416, 421, 348 A. 2d 275, 278 (1975), *cert. denied,* 425 U. S. 942 (1976); *accord, Comptroller of Treasury v. Mandel, Lee, Goldstein, Burch Re-election Comm.,* 280 Md. 575, 578-80, 374 A. 2d 1130, 1132 (1977). When so read, we think it apparent that the Commission's authority is not boundless, and that its thrust is directed toward three principal areas: public accommodations, housing, and employment. If the quoted phrase means what it facially seems to say, then Md. Ann. Code art. 49B, §§ 11 through 23, are surplusage. Further-

---

8. At present there are no sections 4-10 contained in the article. Those sections previously dealing with "Negro scholarships" were repealed by Laws 1963, ch. 41, § 1A.

more, if the phrase is taken literally, the Commission would be empowered to investigate just about every aspect of human behavior, official, non-official, public, or private. It would be, in essence, a "super agency" with awesome powers. We think it clear that the Legislature never intended to confer such limitless authority upon any agency of the State. Indeed, we believe the Legislature, in delegating to the Commission the task of "promoting in every possible way the betterment of human relations," meant that the Commission was to study ways and means of promoting goodwill and harmonious relations between persons of different races, creeds, colors, religions, sexes, ages, and national origins, and to recommend to the Governor proposed legislation designed to further that end.

Notwithstanding the limitations on the Commission's power, it has been held that the Commission may issue subpoenas when it is investigating complaints of discrimination. *Soley v. State Comm'n on Human Relations,* 277 Md. 521, 356 A. 2d 254 (1976); *Banach v. State Comm'n on Human Relations,* 277 Md. 502, 356 A. 2d 242 (1976); *Augusta Bldg. & Loan Ass'n v. State Comm'n on Human Relations,* 39 Md. App. 466, 387 A. 2d 618 (1978); *Vermont Federal Savings & Loan Ass'n v. State Comm'n on Human Relations, Id.*

A question immediately surfaces, *i.e.,* does "study and survey" mean to investigate? If so, then the Commission, pursuant to sections 3 and 14 (d), would be authorized to issue the subpoena and in the event of non-compliance by the recipient thereof, to seek the aid of the courts in compelling production of the subpoenaed material. Md. Ann. Code art. 49B. § 14 (d).[9]

The word "study" has among its myriad of meanings, "to inquire into; investigate: *study the mood of the country." The American Heritage Dictionary of the English Language.*

9. Section 14 (d), Article 49B enables the Commission, "[*i*]*n the administration and enforcement of the provisions of these several subtitles* ... to issue subpoenas, to compel the attendance and testimony of witnesses and the production of books, papers, records and documents relevant or necessary for *proceedings* under the particular subtitle." (Emphasis supplied.)

(1970 ed.). *See also Webster's Third New International Dictionary of the English Language Unabridged* (1976 ed.).

"Survey" is defined *inter alia* as "[a] detailed inspection or investigation." *The American Heritage Dictionary of the English Language* (1970 ed.). *See also generally Webster's Third New International Dictionary of the English Language Unabridged* (1976 ed.).

"Words express whatever meaning convention has attached to them," [10] and convention has attached to "study and survey" the plain meaning of "to investigate." As Mr. Justice Holmes said in *United States v. Brown,* 206 U. S. 240, 244, 27 S. Ct. 620, 51 L. Ed. 1046 (1907), "[W]hatever the consequences, we must accept the plain meaning of plain words." The consequences of the meaning of "study and survey" are that, pursuant to Md. Ann. Code art. 49B, § 14 (d), the Commission may issue a subpoena for relevant documents, papers, records, and witnesses whenever the Commission determines it necessary to so do in order to carry out the responsibilities placed upon it by the Legislature. Md. Ann. Code art. 49B, § 3.

Contrary to the view of the Department-appellant, the Commission is empowered to issue a subpoena whenever that course of action is dictated in furtherance of a study or survey that has been undertaken by the Commission in pursuit of its assigned task to resolve racial problems promptly.

We are supported in our conclusion that the Commission may subpoena relevant materials to aid it in carrying out its function by *Banach v. State of Maryland Comm'n on Human Relations, supra.* Judge Levine, for the majority,[11] said in *Banach:*

"[I]t is argued that the only 'proceedings' for which subsection (d) authorizes subpoenas are the investigation prescribed by § 13 and the § 14 hear-

10. Mr. Justice Holmes in Trimble v. Seattle, 231 U. S. 683, 688, 34 S. Ct. 218, 58 L. Ed. 435 (1914).

11. Chief Judge Murphy dissented. 277 Md. at 517-20. Judge William J. O'Donnell participated in the hearing of the case and in the conference relative thereto, but died before the opinion was adopted by the Court.

ing. This contention that the subpoena power is limited to the post-complaint investigation and hearing stages finds no support in the language of § 14 (d) itself. First, the opening sentence, 'In the administration and enforcement of the provisions of these several subtitles,' suggests a distinction between the 'administrative' and 'enforcement' functions of the commission. Since only §§ 12-16 of Art. 49B are grouped under the 'enforcement' subtitle, the General Assembly apparently intended to extend the use of subpoenas even to areas beyond enforcement investigations and hearings. One such area is suggested by § 3 which empowers the commission, '[w]henever any problem of racial discrimination arises, [to] hold an investigatory hearing' for the purpose of promptly resolving the problem 'by the gathering of all the facts from all the interested parties and making such recommendations as may be necessary.' The 'enforcement' subtitle, in any event, is merely one of five subtitles contained in Art. 49B.

Even more significant, in terms of the statutory language, is the use of the word 'proceedings' in § 14(d) rather than 'hearings.' In our view, this further reflects an intent on the part of the Legislature to authorize subpoenas beyond the narrow limits urged by appellants. Administrative investigations, a vital part of the administrative function, are commonly referred to as 'proceedings.' See 1 K. Davis, Administrative Law § 3.01 (1958). The word 'proceedings' is a term of broad scope, encompassing both the investigative and adjudicative functions of an administrative agency. United States v. Fruchtman, 421 F. 2d 1019, 1021 (6th Cir.), cert. denied, 400 U. S. 849 (1970); Rice v. United States, 356 F. 2d 709, 715 (8th Cir. 1966). Our conclusion that the word 'proceedings' was used in its broad sense here is reinforced by the provision in the Maryland Administrative Procedure Act, Code

(1957, 1971 Repl. Vol.) Art. 41, § 244 (c), which, in defining the term 'contested case,' clearly ascribes a somewhat broader meaning to the term 'proceedings' than to 'an agency hearing,' " 277 Md. 509-10.

This case does not end, however, with a determination that the Commission may issue subpoenas in order to conduct studies and surveys. The next question is obvious, may it subpoena police records in furtherance of its "study and survey" function?

Equating, as we must, "study and survey" with "investigate" we now turn our attention to Md. Ann. Code art. 27, §§ 727-734D, known as the "Law-Enforcement Officers' Bill of Rights."

The Law-Enforcement Officers' Bill of Rights, enacted as Laws 1974, ch. 722, was codified, as we have observed, in Md. Ann. Code art. 27, §§ 727-734. Section 728 (b) (4) provides that "[a] complaint against a law-enforcement officer, alleging brutality in the execution of his duties, may not be investigated unless the complaint be duly sworn to . . . before an official authorized to administer oaths." We note that the "Petition for Order Directing Production of Documents," as filed by the Commission in the circuit court, averred that it had made "[o]n or about July 8, 1976, a *verbal,* on-site request for documents considered relevant and necessary. . . . The questions [*sic*] related to numerous complaints received by the Commission alleging police brutality and harassment against Blacks in Prince George's County." (Emphasis supplied.) While the petition, as filed by the Commission, asseverates "numerous complaints," it does not contain a statement that the complaints have been "duly sworn to before an official authorized to administer oaths." Hence, it is defective in that degree.[12]

---

12. Laws 1977, ch. 366, added section 734C to Article 27. The absence of a sworn complaint takes on greater importance under section 734C, effective July 1, 1977, a period of time well after the April 11, 1976, incidents. Section 734C provides:

"Any person who knowingly makes a false statement, report, or complaint in the course of an investigation or any proceeding

Furthermore, section 728 (b) mandates that "[w]henever a law-enforcement officer is under investigation or subject to interrogation by a law-enforcement agency, for any reason which could lead to disciplinary action, demotion or dismissal, the investigation or interrogation shall be conducted" in accordance with the Law-Enforcement Officers' Bill of Rights.

Even though the Commission performs functions which enforce the laws against discrimination, it is not a "law-enforcement agency" as that term is generally defined,[13] nor is it such an agency with respect to the "Law-Enforcement Officers' Bill of Rights." As used in section 728 (b) of Article 27, "law-enforcement agency" means:

"(1) The Maryland State Police; or

(2) The Baltimore City police department; or

(3) The police department, bureau or force of any county; or

(4) The police department, bureau or force of any incorporated city or town; or

(5) The office of the sheriff of any county; or

(6) The police department, bureau or force of any bicounty agency or the University of Maryland; or

(7) The State Aviation Administration police force of the Department of Transportation, the Mass Transit Administration police force of the

---

conducted under the provisions of this subtitle is subject to the same penalties as provided in Article 27, § 150." (a fine of not more than $500 or imprisonment of not more than six (6) months or both.)

Because of its effective date, section 734C has no application to the instant case.

13. On oral argument, counsel for the Commission stated that the Commission is a law-enforcement agency. We have an entirely different view. We think the Commission is no more of a law-enforcement agency than is the Public Service Commission, the Real Estate Commission, the Insurance Commission, and the like. A law-enforcement agency generally has the power to make arrests. No such authority is vested in the Commission. We add that the Commission is not listed in Md. Ann. Code art. 76A, § 3 (b) (i) as a law-enforcement agency whose records of investigation, etc., are exempt from the public information act.

Department of Transportation, the Maryland toll facilities police force of the Maryland Transportation Authority, and the Maryland Port Administration police force of the Department of Transportation; or

(8) The police officers of the Department of Natural Resources; or

(9) The Maryland Alcohol and Tobacco Tax Enforcement Unit." Art. 27, § 727 (b).

We do not believe that the legislature ever intended to erect a protective shield around a police officer when the officer is confronted by an investigation conducted by a law-enforcement agency and at the same time deny that protection to the officer if the investigation is made by another type of Commission or agency. Such a result would cause the "Law-Enforcement Officers' Bill of Rights" to be little more than a verbalizing of "rights" which are devoid of substance. While it may be argued that the "study and survey" was directed at the Department rather than a particular police officer or officers, it seems to us that of necessity inquiry into the conduct of the officers involved in the April 1976 incident would have to be made.[14] The provisions of the Law-Enforcement Officers' Bill of Rights may not be avoided by addressing a Department instead of the individual police officer. If, as here, an end run around the Law-Enforcement Officers' Bill of Rights may be made by directing inquiry to the Department from which font floweth the information necessary to complete an investigation of alleged brutality against individual officers, "rights" conferred by Md. Ann. Code art. 27, §§ 727-734D are relegated to myth.

Moreover, the information sought by the Commission is further barred under Md. Ann. Code art. 76A (Public Information) in that section 3 (a) (i) thereof excludes inspection if the same "would be contrary to any State

---

14. The Commission's request for information asked that it be furnished with "[t]he names of all police officers at the scene of the incident" as well as "all patrol assignments in the Glenarden community from April 9, 1976, thru April 17, 1976."

statute." In the case *sub judice,* the inspection is contrary to Md. Ann. Code art. 27, § 734B. Section 3 (b) (i) of Article 76A exempts from public inspection "[r]ecords of investigations conducted by, or of intelligence information or security procedures of, any sheriff, county attorney, city attorney, the Attorney General, police department or any investigatory files compiled for any other law-enforcement or prosecution purposes. . . ." The Court of Appeals, in *Superintendent, Maryland State Police v. Henschen,* 279 Md. 468, 475, 369 A. 2d 558, 562 (1977), said that "when the documents in question constitute records of an investigation by a police department (or sheriff's office or any of the other law enforcement agencies specifically listed in § 3 (b) (i)), there need not be an actual showing that the records were compiled for law enforcement or prosecution purposes for the exception to be applicable."

The release of the information to the Commission for "study and survey" would create an additional problem. Md. Ann. Code art. 49B, § 16 provides:

"(a) During the investigation of any complaint alleging a violation of §§ 11, 11B, 17, 18, 19, or 23 of this article, and until said matters reach the stage of public hearings, the activities of all members of the Commission and employees thereof in connection with said investigation shall be conducted in confidence and without publicity, and the Commission shall hold confidential any information in relation thereto, including the identity of the complainant and the respondent, except that

(i) Any information may be released at any time if the release has been agreed to in writing by both complainant and respondent; and

(ii) The identity of the complainant may be disclosed to the respondent at any time;

(b) Any member of the Commission or employee thereof, who violates the provisions of this section shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not more than

"$1,000.00 or imprisoned not more than one year or both."

It is to be noted that section 3 (a) of Article 49B is conspicuously absent from those enumerated sections of the statute shielded by a cloak of confidentiality during the investigatory stages of the Commission's inquiry. Hence, if the Commission were successful in obtaining the sought documents in the instant case, the strictures of section 16 would not apply, and in theory, at least, the content thereof could be disclosed publicly without fear of the sanctions prescribed by section 16.

The Legislature, however, was not unaware of its own acts, and to be certain that all conflicts among prior statutes and the Law-Enforcement Officers' Bill of Rights could be readily resolved, the Legislature established the superiority of the Law-Enforcement Officers' Bill of Rights by providing in section 734B thereof:

"The provisions of this subtitle [Law-Enforcement Officers' Bill of Rights] shall supercede any State, county or municipal law, ordinance, or regulation that conflicts with the provisions of this subtitle, and any local legislation shall be preempted by the subject and material of this subtitle."

While the Commission was given authority, by the General Assembly, in the spheres of public accommodations,[15] housing, and employment, nothing in Md. Ann. Code art. 49B confers upon the Commission the right or duty to investigate police matters unrelated to those specified areas. If the Legislature intended the Commission to exercise authority over allegations of police brutality, it could have enacted such a provision. In the absence of such express legislative intent, it is not the role of the judiciary to extend by fiat the powers of any administrative body. *Scoville Serv., Inc. v. Comptroller,*

---

**15.** Counsel for the Commission, on oral argument, suggested that police departments exist for the "public accommodation," and, therefore, police departments fall within the scope of the Commission's express authority. That suggestion finds no basis in the law. *See* "public accommodation," as explicitly defined in Md. Ann. Code, art. 49B, § 11.

269 Md. 390, 394, 306 A. 2d 534 (1973); *Department of Motor Vehicles v. Greyhound,* 247 Md. 662, 668, 234 A. 2d 255 (1967); *Amalgamated Ins. v. Helms,* 239 Md. 529, 535-36, 212 A. 2d 311 (1965); *Kassab v. Burkhardt,* 34 Md. App. 699, 705, 368 A. 2d 1064 (1977).

Where the Legislature grants authority in certain enumerated areas, it cannot be presumed to intend that grant to apply to other areas which it has not chosen to specify. It is an elemental rule of statutory construction that *"expressio unius est exclusio alterius."*[16] *See Gay Investment Co. v. Comi,* 230 Md. 433, 438, 187 A. 2d 463 (1963).

We hold that Md. Ann. Code art. 27, §§ 727-734D supercedes and takes precedence over Md. Ann. Code art. 49B insofar as the investigation, including a "study and survey," is concerned, and that the Commission does not possess the authority to investigate matters involving allegations of police brutality or harassment.

We note that two bills which would have precluded a court's construing Md. Ann. Code art. 27, § 734B to bar the Human Relations Commission's inquiring into "cases of alleged police brutality" received unfavorable committee reports in the 1978 Maryland General Assembly. The two (2) bills were identical except for their being introduced in the State Senate as S.B. No. 1241 and in the House of Delegates as H.B. No. 1982, respectively.[17]

---

16. "The expression of one thing is the exclusion of another."

17. S.B. No. 1241 and H.B. No. 1982 provided in pertinent part:

"The provisions of this subtitle shall supercede any State, county or municipal law, ordinance, or regulation that conflicts with the provisions of this subtitle FOR THE PROCEDURE TO BE FOLLOWED AT INTERROGATION, INVESTIGATION, HEARING, OR APPEAL, and any local legislation RELATING TO THESE PROCEDURES shall be preempted by the subject and material of this subtitle. THIS SUBTITLE MAY NOT BE CONSTRUED TO PRECLUDE A HUMAN RELATIONS COMMISSION FROM EXERCISING ITS AUTHORITY UNDER A LOCAL LAW TO INVESTIGATE CASES OF ALLEGED POLICE BRUTALITY. A LOCAL GOVERNING BODY MAY, BY ORDINANCE, PROVIDE THAT IN THE CASE OF COMPLAINTS ALLEGING POLICE HARASSMENT, THE EXCESSIVE USE OF FORCE IN THE PERFORMANCE OF DUTY, OR THE USE OF LANGUAGE WHICH WOULD DEMEAN THE INHERENT DIGNITY OF ANY PERSON, A

A third bill, H.B. No. 1012, filed on January 25, 1978, sought to amend section 728 (b) (4) by adding a provision permitting the convening of "an investigation or a hearing . . . in conformity with local law, ordinance or regulation in response to a complaint initiated by or at the request of the Human Relations Commission. . . ." That bill would also have altered Md. Ann. Code art. 27, § 730 by inserting language so as to allow the local governmental authority to authorize an investigation or hearing by the Commission whenever there is a complaint of "brutality or prohibited acts of discrimination." [18] It also received an unfavorable committee report.

---

HUMAN RELATIONS COMMISSION, AFTER INVESTIGATION, MAY REQUEST THE COUNTY EXECUTIVE OR COUNTY COMMISSIONERS, OR MAYOR OF A MUNICIPALITY, TO DIRECT THE CHIEF OF THE LOCAL POLICE DEPARTMENT TO CONVENE AN ADMINISTRATIVE HEARING. IF SO DIRECTED, THE CHIEF SHALL CONVENE AN ADMINISTRATIVE HEARING AS PROVIDED IN SECTION 730 OF THIS SUBTITLE."

**18.** H.B. No. 1012 provided in pertinent part:

"(4) A complaint against a law-enforcement officer, alleging brutality in the execution of his duties, may not be investigated unless the complaint be duly sworn to by the aggrieved person, a member of the aggrieved person's immediate family, or by any person with firsthand knowledge obtained as a result of the presence at and observation of the alleged incident, or by the parent or guardian in the case of a minor child before an official authorized to administer oaths. IN ADDITION, AN INVESTIGATION OR A HEARING MAY BE CONVENED IN CONFORMITY WITH A LOCAL LAW, ORDINANCE, OR REGULATION IN RESPONSE TO A COMPLAINT INITIATED BY OR AT THE REQUEST OF A HUMAN RELATIONS COMMISSION WHEN THE COMPLAINT ALLEGES THAT A LAW-ENFORCEMENT OFFICER HAS ENGAGED IN CONDUCT OF BRUTALITY OR PROHIBITED ACTS OF DISCRIMINATION. THE PROVISIONS OF ANY LOCAL LAW, ORDINANCE, OR REGULATION NOTWITHSTANDING, AN INVESTIGATION OR HEARING CONDUCTED BY A LAW-ENFORCEMENT AGENCY IN RESPONSE TO A COMPLAINT INITIATED BY OR AT THE REQUEST OF A HUMAN RELATIONS COMMISSION SHALL BE CONDUCTED IN CONFORMITY WITH THE PROVISIONS OF THIS SUBHEADING AND ACCORD THE LAW-ENFORCEMENT OFFICER ALL THE RIGHTS UNDER THIS SUBHEADING. An investigation OR HEARING which could lead to disciplinary action under this subtitle for brutality may not be initiated and an action may not be taken unless the complaint is filed within 90 days of the alleged brutality.

The net effect of all the proposed bills would have been to strengthen substantially the powers of the Commission so as to authorize it to do what it seeks to do here.

We may, as we have herein done, consider rejection by the General Assembly of S.B. 1241, H.B. 1982, and H.B. 1012 as an indication of the legislative will. *Demory Brothers v. Bd. of Public Works,* 20 Md. App. 467, 473, 316 A. 2d 529 (1974), *aff'd,* 273 Md. 320, 329 A. 2d 674 (1974). In *Demory* we observed that "[i]t has been held that a legislative body's rejection of a statutory amendment is significant because it throws light upon the legislative intent. *See Madden v. Brotherhood and Union of TR. Employees,* 147 F. 2d 439, 443 (4th Cir. 1945); *Safeway Stores v. Bowles,* 145 F. 2d 836, 844 (U.S. Emer. Ct. App. 1944), *cert. denied,* 324 U. S. 847, 65 S. Ct. 683, 684, 89 L. Ed. 1408 (1945); *State v. Chicago N.W. Ry. Co.,* 147 Neb. 970, 976, 25 N.W.2d 824, 828 (1947)." 20 Md. App. at 473. Although the Court of Appeals has "never held that the amendment-rejection theory is a completely determinative method of ascertaining legislative intent, [they] have indicated that such action strengthens the conclusion that the Legislature did not intend to achieve the results the amendment would have achieved, if adopted." *Demory Brothers v. Bd. of Public Works,* 273 Md. at 326. *See also Bosley v. Dorsey,* 191 Md. 229, 240, 60 A. 2d 691, 696 (1948). That the 1978 session of the Legislature refused to enlarge its grant of power to the Commission at the expense of law-enforcement officers is a conclusion that may be drawn from rejection of the proposed amendments.

---

730.
    (a) If the investigation or interrogation of a law-enforcement officer results in the recommendation of some action, such as demotion, dismissal, transfer, loss of pay, reassignment, or similar action which would be considered a punitive measure, then, except in the case of summary punishment [or], emergency suspension as allowed by § 734A of this subtitle, OR UNLESS A HEARING IS REQUIRED TO BE HELD BY A LOCAL LAW, ORDINANCE, OR REGULATION, and before taking that action, the law-enforcement agency shall give notice to the law-enforcement officer that he is entitled to a hearing on the issues by a hearing board. The notice shall state the time and place of the hearing and the issues involved. An official record, including testimony and exhibits, shall be kept of the hearing."

We think the circuit court should have refused to issue the order compelling compliance with the subpoena, and, accordingly, we reverse that order.

*Order reversed.*
*Costs to be paid by appellee.*