900 A.2d 243

**Paul DEL MARR**

v.

**MONTGOMERY COUNTY, Maryland.**

**No. 2789, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

June 5, 2006.

Douglas M. Gross (Chirumbole, Gross & Conrad, P.C. on the brief), Gaithersburg, for appellant.

Wendy B. Karpel (Sharon V. Burrell, Charles W. Thompson, Jr., County Attorney on the brief), Rockville, for appellee.

Argued before SALMON, SHARER and CHARLES E. MOYLAN, JR., (Retired, Specially Assigned) JJ.

SHARER, J.

Appellant, Paul Del Marr, appeals from a decision by the Circuit Court for Montgomery County granting appellee's, Montgomery County's ("County"), motion for summary judgment. The effect of the grant of summary judgment was a partial reversal of an order of the Maryland Workers' Compensation Commission ("Commission") awarding credit to the County, on a weeks-credit rather than dollar-credit format, for compensation benefits paid to appellant.

Appellant raises one question for our review, which, as rephrased, is: [1]

When a claimant reopens a claim for worsening of condition, and the award is increased from a first-tier injury to a second-tier injury, is credit to the employer to be made on

---

1. In his brief, appellant argues:
WHERE CLAIMANT RE–OPENED HIS WORKERS' COMPENSATION CLAIM DUE TO A WORSENING OF CONDITION AND INCREASED THE AMOUNT OF PERMANENT DISABILITY FROM A FIRST TIER AWARD TO A SECOND TIER AWARD THE EMPLOYER IS ENTITLED TO A CREDIT FOR THE AMOUNT OF DOLLARS IT PAID PURSUANT TO THE EARLIER AWARD IN COMPLIANCE WITH *Norris v. United Cerebral Palsy*, 86 Md.App. 508, 587 A.2d 557 (1991).

the basis of dollars paid, or the number of weeks for which compensation was paid?

For the reasons discussed herein, we shall affirm the circuit court's judgment.

## FACTUAL BACKGROUND

Since the underlying facts are not at issue in this case, we recount them only briefly. On January 9, 2001, appellant, a master electrician for the Montgomery County Board of Education, suffered a compensable injury to his lower back while lifting a heavy transformer. Appellant filed a claim for benefits with the Commission on January 31, 2001, under the Maryland Workers' Compensation Act ("Act"). *See* Md.Code, Lab. & Empl. ("L.E.") §§ 9–101 *et seq.* (1999 Rep. Vol., 2005 Supp.).

On April 18, 2002, the Commission held a hearing on appellant's claim and, on May 2, 2002, issued its first award of benefits based on a finding that appellant had sustained a permanent partial disability.[2] The Commission's subsequent awards to appellant and the procedural history of this case, are detailed, *infra.*

## STANDARD of REVIEW

In *Stanley v. American Fed'n of State & Local Mun. Employees Local No. 553,* 165 Md.App. 1, 13, 884 A.2d 724 (2005), we noted that,

> [u]nder Maryland Rule 2–501(f), summary judgment may be granted "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law."

---

2. "This kind of disability has been defined as the inability to do work of any kind. But the Courts have also indicated that total disability is not to be interpreted as utter and abject helplessness." Cornblatt, Meredith, and Sevel, *Workers' Compensation Manual* 21 (12th ed. 2005) ("Manual").

We review a circuit court's order granting summary judgment *de novo.* We determine whether there is any dispute of material fact, and, if there is none, we then determine whether the court was legally correct in its ruling. As we undertake this review, " 'we construe the facts properly before the court, and any reasonable inferences that may be drawn from them, in the light most favorable to the nonmoving party.' " " 'We ordinarily will uphold the grant of summary judgment only on a ground relied on by the trial court.' "

(Internal citations omitted). As well, "[q]uestions of statutory construction and interpretation are questions of law." *Marzullo v. Kahl,* 135 Md.App. 663, 671, 763 A.2d 1217 (2000). Thus, we review the circuit court's decision *de novo.*

## DISCUSSION

### *Maryland Workers' Compensation Act*

"The [Act] was originally enacted in 1914 to compensate employees for the loss of earning capacity resulting from accidental injury, disease, or death occurring during the course of employment." *Philip Elecs. N. Am. v. Wright,* 348 Md. 209, 215, 703 A.2d 150 (1997) (citing *DeBusk v. Johns Hopkins,* 342 Md. 432, 437, 677 A.2d 73 (1996)). Pursuant to L.E. § 9–501, persons accidentally injured at work may be entitled to a variety of benefits from their employers, regardless of fault. *See also Mayor & City Council of Balt. City v. Johnson,* 156 Md.App. 569, 586, 847 A.2d 1190 (2004), *aff'd* 387 Md. 1, 874 A.2d 439 (2005). "The Act essentially is remedial, social legislation designed to protect workers and their families from various hardships that result from employment-related injuries." *Livering v. Richardson's Rest. & PMA,* 374 Md. 566, 574, 823 A.2d 687 (2003). In *Johnson, supra,* 156 Md.App. at 587–88, 847 A.2d 1190, we noted:

The Act was conceived to protect workers and their families, among others. But, as the Court of Appeals has explained several times, including in *Polomski,* 344 Md. at 76, 684 A.2d 1338 "[a]lthough the Act's name suggests that it was

intended solely for the benefit of employees, the preamble to the 1914 Act, and, indeed, [the Court's] previous holdings, reveal otherwise." The Court has made clear that, "[i]n reality, the Act protects employees, employers, and the public alike."

(Internal citations omitted).

Among the benefits available to employees is monetary compensation for permanent partial disability. *See* L.E. § 9–625. Section 9–627, the so-called "listed member" provision, specifies the number of weeks of compensation to which a claimant is entitled, depending upon which part of the claimant's body is injured. Appellant's injury fell under the "other cases" category of injuries covered specifically by subsection 9–627(k).[3] Under this sub-section, appellant could receive a maximum of 500 weeks of compensation, dependent upon the percentage of his disability. *See* L.E. § 9–627(k)(3).

Pursuant to L.E. § 9–627(k)(4), compensation is paid "at the rates listed for the period in §§ 9–628 through 9–639[.]" These sections establish a tier structure for determining the actual amount of compensation.

Section 9–628 states, in pertinent part:

---

**3.** L.E. § 9–627(k) provides:
 (k) *Other cases.*—(1) In all cases of permanent partial disability not listed in subsections (a) through (j) of this section, the Commission shall determine the percentage by which the industrial use of the covered employee's body was impaired as a result of the accidental personal injury or occupational disease.
 (2) In making a determination under paragraph (1) of this subsection, the Commission shall consider factors including:
(i) the nature of the physical disability; and
(ii) the age, experience, occupation, and training of the disabled covered employee when the accidental personal injury or occupational disease occurred.
 (3) The Commission shall award compensation to the covered employee in the proportion that the determined loss bears to 500 weeks.
 (4) Compensation shall be paid to the covered employee at the rates listed for the period in §§ 9–628 through 9–630 of this Part IV of this subtitle.

(e) *On or after January 1, 2000.*—Except as provided in subsections (f) and (g) of this section, if a covered employee is awarded compensation for less than 75 weeks in a claim arising from events occurring on or after January 1, 2000, the employer or its insurer shall pay the covered employee compensation that equals one-third of the average weekly wage of the covered employee but does not exceed $114.

Section 9–628 is considered the first tier level.

Section 9–629 is considered the second or middle tier and provides:

## Compensation for period equal to or greater than 75 weeks but less than 250 weeks.

If a covered employee is awarded compensation for a period equal to or greater than 75 weeks but less than 250 weeks, the employer or its insurer shall pay the covered employee weekly compensation that equals two-thirds of the average weekly wage of the covered employee but does not exceed one-third of the State average weekly wage.

The third tier, § 9–630, covers serious disabilities and provides, in pertinent part:

## Serious disability—Compensation for 250 weeks or more.

(a) *In general.*—(1) Except as provided in paragraph (2) of this subsection, if a covered employee is given an award or a combination of awards resulting from 1 accidental personal injury or occupational disease for 250 weeks or more under § 9–627 of this subtitle:

(i) the Commission shall increase the award or awards by one-third the number of weeks in the award or awards, computed to the nearest whole number; and

(ii) the employer or its insurer shall pay the covered employee weekly compensation that equals two-thirds of the average weekly wage of the covered employee, but does not exceed 75% of the State average weekly wage.

(2) An award for disfigurement or mutilation under § 9–627(i) of this subtitle may not be used to make up the 250 weeks under paragraph (1) of this subsection.

(b) *More than one concurrent employer.*—(1) This subsection applies to the payment of weekly compensation required under subsection (a) of this section if the average weekly wage of a covered employee is computed under § 9–602(1) of this subtitle.

(2) The employer in whose employment the accidental personal injury occurred or the employer's insurer shall pay the covered employee weekly compensation that is based on the weekly wages of the covered employee at the employment in which the covered employee was injured.

(3) Subject to paragraph (4) of this subsection, any additional weekly compensation resulting from computing the average weekly wage based on weekly wages earned by the covered employee in other employment shall be payable in the first instance by the employer in whose employment the employee was injured or the employer's insurer.

(4) Subject to any right of the Subsequent Injury Fund to be impleaded or any right of the Subsequent Injury Fund to defend in a case involving payment from the Subsequent Injury Fund created under Title 10, Subtitle 2 of this article, as allowable under Subtitle 8 of this title, the Subsequent Injury Fund shall reimburse the employer in whose employment the employee was injured or the employer's insured the amount of additional weekly compensation paid by the employer or insurer under paragraph (3) of this subsection.

(c) *Relation to other provisions.*—(1) Except as provided in paragraph (2) of this subsection, § 9–627 of this subtitle applies to covered employees who are covered by this section.

(2) To the extent of any inconsistency, this subsection prevails over § 9–627 of this subtitle.

Notably, L.E. § 9–630(d) provides that upon reopening a claim "[i]f a covered employee receives additional compensa-

tion for a disability on a petition to reopen for serious disability, the additional compensation *may not increase the amount of compensation previously awarded and paid.*" (emphasis added) No similar provision, addressing the procedure for an award of additional compensation, upon re-opening a claim, is found in either L.E. §§ 9–628 or 9–629.

### Appellant's Injury Calculations

Pursuant to appellant's claim, the Commission made the following series of awards:

*Order I*—On May 2, 2002, the Commission found that appellant sustained a 20% loss of the use of the body as a result of an injury to the back, 10% of which was due to a pre-existing condition. Under L.E. § 9–628, the rate of compensation was $114 per week for 50 weeks.

*Order II*—On January 9, 2003, the Commission, by stipulation of the parties,[4] ordered an increase in the rate of industrial loss of the use of the body as a result of permanent partial disability to 24%, 14% related to the accidental injury (a 4% increase over Order I) and 10% due to a pre-existing condition. The rate of compensation for this injury remained the same, $114 per week, because the percentage of injury, 14%, kept the claim within Tier 1; the total number of weeks to be compensated increased, however, from 50 from 70 (14% multiplied by 500 equals 70 weeks).

*Order III*—On May 26, 2004, in response to appellant filing a petition to reopen his claim due to a worsening of his condition, pursuant to L.E. § 9–736,[5,6] the Commission

---

4. Order I had been appealed by appellant. While the appeal was pending, the parties entered into a stipulation providing for the amounts indicated in Order II.

5. Appellant's condition apparently worsened as he suffered additional problems with his back and underwent a subsequent surgery.

6. L.E. § 9–736(a) provides:

 (a) *Readjustment of rate of compensation.*—If aggravation, diminution, or termination of disability takes place or is discovered after the rate of compensation is set or compensation is terminated, the

found that appellant's partial permanent disability to the body was 33%, 23% due to accidental injury (a 9% increase) and 10% due to a pre-existing condition.[7] That resulted in an increase in the award from 14% to 23%; thus, *appellant's compensation award moved from a Tier 1 level injury to a Tier 2 level injury* (23 percent multiplied by 500 equals 115 weeks).

Under Order III, appellant was entitled to 115 weeks of compensation, subject to an offsetting credit for payments of dollars made by the County under Order II, which translated to 70 weeks of compensation under Tier 1 for a total of $7,980. By ordering a dollar-credit for the amount previously paid under Order II, rather than a weeks-credit, the County calculated that it was potentially liable for a windfall to appellant.

The purported windfall was calculated as follows: In Order III, the total compensation awarded was $25,645 (115 weeks multiplied by $223). The amount of money awarded, and paid,

---

Commission, on the application of any party in interest or on its own motion, may:
　(1) readjust for future application the rate of compensation; or
　(2) if appropriate, terminate the payments.

7. Order (3) stated the following:
　　Hearing was held in above claim at Beltsville, Maryland on May 11, 2004, on the claimant's Petition to Reopen on Worsening of Condition; said Petition was granted; and as a result thereof, it is this 26th day of MAY, 2004, by the Workers' Compensation Commission ORDERED that the above-named insurer pay the above-named claimant compensation as follows:
　1. *TEMPORARY TOTAL DISABILITY:*
　　Paid from January 9, 2001 to March 23, 2001 and from November 16, 2002 to February 14, 2003 inclusive; based on an average weekly wage of $873.20 for an accidental injury sustained on January 8, 2001.
　2. *PERMANENT PARTIAL DISABILITY:*
　　Now 33% industrial disability to the body due to an injury to the back; 23% (an increase of 9%) is due to this accidental injury, and 10% is pre-existing, pay claimant at the rate of $223.00, payable weekly, beginning at the end of compensation awarded under Order dated January 9, 2003, for a period of 115 weeks; subject to credit for payments made under Order dated May 2, 2002 as AMENDED under Order dated January 9, 2003; and pay causally connected medical expenses in accordance with the Medical Fee Guide.

under Orders I and II was $7,980 (70 weeks multiplied by $114). Under a dollar-credit formulation, therefore, appellant was still owed $17,665 ($25,645 minus $7,980). Under the County's weeks-credit calculation, since it had previously paid 70 weeks of compensation, Order III required that it pay only 45 more weeks of compensation at the Tier 2 level, for a remaining payment of $10,035 (45 weeks multiplied by $223). Thus, the amount at issue in this appeal is the difference between the dollar-credit ($17,665) and the weeks-credit ($10,-035), or $7,630. The Commission did not adopt the County's position; thus, the County sought judicial review of Order III in the circuit court.

On November 9, 2004, the County filed a motion for summary judgment challenging Order III, not on the basis of the increased percentage of disability awarded to appellant, but on the Commission's determination of the form of credit due the County for payments previously made. Appellant likewise moved for summary judgment.

On February 8, 2005, after a hearing on the cross-motions for summary judgment, the circuit court granted the County's motion, ruling from the bench that the County was entitled to a credit for the number of weeks of benefits paid, rather than the amount of dollars.[8] On that same date, the court memori-

---

8. In rendering its decision, the circuit court stated:

All right. This case really calls for an interpretation of what was intended by the legislature as considered by our appellate courts. The Court is satisfied that the AMTEC [sic] case is a guide as to how this matter should come out and the Court determines that it should be decided on a weekly basis.

I listened carefully to what you had to say, [appellant's counsel below], and frankly I'm making a legal decision and I just see it another way. And maybe you're right and maybe you're not. I don't know to be honest with you. Only the folks down in Annapolis can really help us out on that if it comes to that.

So I'm going to, insofar, this is a motion, this is a cross-motion for summary judgment. I'm granting the [County's] motion in connection with this claim, which, as so the record is clear, obligated the [County] to make payments but not to make the lump sum retroactive payment, I guess is the best way to put it.

alized its oral opinion with a written order. Appellant noted this timely appeal of that decision.

## Analysis

Appellant maintains that the legislatively mandated method for calculating the credit to be awarded in cases of re-opening differs when the subsequent award is increased to Tier 3, rather than to Tier 2, as in the case *sub judice.*[9] Our holding follows the Court of Appeals' most recent guidance in *Ametek v. O'Connor,* 364 Md. 143, 771 A.2d 1072 (2001). In order to provide context for our discussion of that holding, and given that our holding in this case departs from previous decisions of this Court, we begin with an analysis of the significant case law in this area.

In *Norris v. United Cerebral Palsy,* 86 Md.App. 508, 511, 587 A.2d 557 (1991), this Court addressed the question of a weeks-credit where the claimant's reopening resulted in an increased compensation award from Tier 1 to Tier 2.

Norris's award for partial permanent disability, under "other cases," rose from 10% to 30%.[10] *Id.* On his petition for reopening, the Commission awarded the employer a dollar-credit, "for the amount previously paid." *Id.* The circuit court disagreed and, applying the language of then Art. 101 § 36(3)(a)(iii), ordered a weeks-credit. *Id.* at 513, 587 A.2d 557. Thus, the question before this Court then was, in large part, the same as the one before us now.

The *Norris* Court discussed the legislative intent in placing the "cap language" "proviso" within subparagraph (iii) alone and not other subsections of the statute. The Court noted

As we have already indicated, the language of the proviso is not at all ambiguous; in fact, it is clear, unambiguous and susceptible of only one meaning. When, however, one

---

**9.** Appellant acknowledges that an increase to the Tier 3 level would put his claim squarely under the authority of L.E. § 9–630(d) requiring a weeks-credit.

**10.** This increase essentially mirrors a current Tier 1 to Tier 2 increase.

considers its location, *i.e.*, being placed at the end of subparagraph (iii), an element of ambiguity is introduced.[11]

*Id.* at 516, 587 A.2d 557 (internal citations omitted).

Ultimately, given this ambiguity, the *Norris* Court found "it appropriate to apply the rule of statutory construction which requires that the benefit of the doubt be given to the worker" and held that the employer was only entitled to a dollar, rather than a weeks, credit for previous payments made to Norris.

In *Philip Elecs., supra,* 348 Md. at 212, 703 A.2d 150, the Court of Appeals was called upon to

determine whether, after an award [pursuant to the Workers' Compensation Act, Maryland Code (Repl.Vol.1991, 1997 Supp.)] to a claimant is reduced pursuant to a petition for judicial review, the employer is entitled to a credit for the total amount of money paid to the claimant before the reduction of the original award, or whether the appropriate credit is the number of weeks the employer paid benefits prior to the reduction.

Wright, the injured employee, had been awarded compensation for a knee injury (an "other cases" injury) under L.E. § 9–627(k) at the Tier 3 level.[12] Both Wright and Philip Electronics filed for judicial review of the Commission's award. *Id.* at 213, 703 A.2d 150. The jury returned a verdict

---

11. Given our ultimate resolution of the case *sub judice,* we do not subscribe to the view, urged by appellant, that amendments to the statute further emphasize a disparity between the legislature's treatment of Tier 2 and Tier 3 petitions to reopen.

12. In *Philip Elecs., supra,* 348 Md. at 213, 703 A.2d 150, the Court noted:

By written order, on November 30, 1992, the Commission found that Wright had suffered a permanent partial disability loss of 50% of the use of her body as a whole, under "other cases," due to the injury to her knee and the resulting psychological condition. *See* § 9–627(k). Accordingly, the Commission ordered Philip Electronics to pay Wright permanent partial disability benefits at the rate of $178 per week for 333 weeks pursuant to § 9–630.
(Footnote and internal citation omitted).

finding that Wright had suffered loss of use of her body at a *lower* level than that found by the Commission, entitling her to compensation at the Tier 2 level.[13] *Id.* "Significantly, the Commission also gave Philip Electronics a credit for the amount of the monetary payments made under the Commission's original order...." *Id.*

Notably, in this case of a reduction in benefits, the economic incentives, and the litigating positions of the employer and employee, were effectively reversed from the case *sub judice* and from other similar cases. On remand the Commission ordered a dollar-credit. When again before the circuit court, Wright claimed that the Commission erred in awarding Philip Electronics a dollar-credit rather than a weeks-credit for payments made under the Tier 3 designation. The circuit court affirmed the Commission's decision. *Id.* at 213–14, 703 A.2d 150.

This Court reversed the judgment of the circuit court, holding that Philip Electronics was entitled to a weeks-credit, not a dollar-credit. *Id.* at 214, 703 A.2d 150. The Court of Appeals affirmed this Court, noting that "the language of § 9–627(k), as well as the language of § 9–629 and § 9–630, clearly and unambiguously demonstrate a legislative commitment to the payment of permanent partial disability benefits within a weekly framework." *Id.* at 218, 703 A.2d 150. Citing previous decisions construing the Act, the Court noted that:

> Taken together, [previous cases] and the plain language of the Act stand for the proposition that the General Assembly intended that an employer's credit for the payment of permanent partial disability benefits be based upon the number of weeks of compensation previously paid, absent clear legislative expression to the contrary. Accordingly, we hold that when a claimant's initial award by the Commission is reduced pursuant to a petition for judicial review, an employer shall be entitled to a credit for the number of

---

13. On remand, [from the circuit court's finding], the Commission recalculated Wright's benefits, and found that she was entitled to $144 per week for 200 weeks.

weeks of benefits actually paid in accordance with the original order, rather than a credit based upon the amount of money previously paid to the worker.

*Id.* at 225–26, 703 A.2d 150. The Court also found that a weeks-credit comported with the fundamental purpose of compensation for injured employees "to receive the weekly payment of benefits for the allotted number of weeks, . . . ." *Id.* at 226, 703 A.2d 150.

This Court has addressed two similar cases, each of which further illuminate our discussion. First, in *Ametek, Inc. v. O'Connor*, 126 Md.App. 109, 111, 727 A.2d 437 (1999), we were faced with determining "how to calculate the credit due to an employer/insurer for benefits paid to a claimant prior to an increase in the claimant's award that resulted from judicial review."

O'Connor, an employee of Ametek Inc., had been granted Tier 1 compensation by the Commission, which was then increased to Tier 3 following a trial in the circuit court.[14] As in the case *sub judice,* the employer urged that the credit be applied on a weeks-credit rather than a dollar-credit basis. *Id.* Noting that the Act is a remedial statute to be "liberally construed in favor of employees," we outlined the Court of Appeals' reasoning in the *Philip Elecs.* case, among others,[15] focusing on the Act's benevolent purposes rather than strictly on the *Philip Elecs.* Court's eventual holding awarding a weeks-credit. *Id.* at 118–19, 727 A.2d 437. We stated that we

---

14. Initially, the Commission found that O'Connor had sustained a permanent partial disability of 10% of her body as a whole. Accordingly, the Commission determined that the Claimant was entitled to benefits of $81.00 per week for 50 weeks. After a jury found that appellee had sustained a permanent partial disability of 70% of the body as a whole, the Commission determined that the Claimant was entitled to disability benefits of $134.00 per week for 467 weeks. *Id.* at 111, 727 A.2d 437.

15. *See, e.g., Miller v. Sealy Furniture Co.,* 125 Md.App. 178, 724 A.2d 743 (1999) and *Montgomery County v. Lake,* 68 Md.App. 269, 511 A.2d 541 (1986).

ha[d] not uncovered any case suggesting that . . . a claimant should receive less in benefit dollars than he or she is otherwise entitled to recover . . . Instead, . . . the Act is liberally construed so as to minimize hardship to the employee and his or her dependents. Consequently, absent a clear legislative directive, the approach that inures a benefit to the employee is ordinarily favored.

*Id.* at 122, 727 A.2d 437.

We concluded by stating that, "when an award is increased upon judicial review, the Employer is not entitled to a credit based on the number of weeks for which benefits were paid." *Id.* at 123, 727 A.2d 437. Rather, the employer is entitled to a credit for the total amount of money actually paid to the claimant prior to the increase.

Our next consideration of the subject occurred in *Anne Arundel County v. Tierney,* 132 Md.App. 149, 751 A.2d 35 (2000). Tierney was originally awarded compensation for permanent partial disability based upon a 19.5% loss of use of a leg. *Id.* at 151, 751 A.2d 35. Tierney sought to reopen, and succeeded in showing a worsening of his condition, resulting in an increased award. *Id.* The Commission, on remand, credited the employer "for benefits previously paid based on a calculation of a dollar amount." *Id.* at 152, 751 A.2d 35. The employer argued for a weeks-credit, reasoning that the case differed from our decision in *Ametek* because the employee's compensation award was increased due to a re-opening rather than upon judicial review of the original award. *Id.* at 152–53, 771 A.2d 1072.

Relying on our decision in *Ametek,* and again distinguishing *Philip Electronics,* we found that a weeks-credit was inappropriate where an employee "sought and obtained an increase— not a decrease—in permanent partial disability benefits." *Id.* at 154–55. The *Tierney* Court stated:

We are confronted, as we were in *Ametek,* with a case in which the claimant is asking for an increase in benefits due to a worsening condition. Appellants' contention that *Ametek* is distinguishable from the instant case is not persuasive.

That the instant appeal involves a reopening of a claimant's case as opposed to an appeal from a final judgment, is of no moment; as a consequence, the procedural distinction precludes the court from using the dollar approach, as long as that approach benefits the employee. The Act is a remedial statute and, as stated, *supra*, must be construed in favor of the injured claimant.

\* \* \*

Under the circumstances of this case, and because appellee's claim involves an increase in disability benefits, we perceive no error by the Commission, or the circuit court, in determining that appellants are entitled to a credit in a fixed dollar amount, rather than a weekly credit. We stated, in *Ametek*, that workers' compensation cases must always be determined on a case-by-case basis; using the dollar approach is more beneficial to appellee and is consistent with the benevolent purpose and the legislative intent of the Act. Perceiving no material factual distinction, we accordingly adopt our ultimate holding in *Ametek*.

*Id.* at 156–57, 751 A.2d 35 (internal citations omitted).

Our analysis in these cases was undone by the Court of Appeals in *Ametek v. O'Connor*, 364 Md. 143, 771 A.2d 1072 (2001).[16] In *Ametek*, the Court framed the issue as

whether, after a claimant's workers' compensation award is increased on judicial review, the employer and insurer are entitled to a credit for the total amount paid to the claimant pursuant to the award or just a credit for the number of weeks the employer/insurer paid benefits.

*Id.* at 144–45, 771 A.2d 1072.

As we noted, O'Connor was awarded Tier 3 compensation after petitioning for judicial review of the Commission's original award of Tier 1 compensation. We affirmed the circuit court, which reversed the Commission, and ordered a dollar-credit to the employer. The Court of Appeals, however, disa-

---

**16.** This decision followed our decision in *Tierney* by just a few months.

greed, noting that its decision in *Philip Electronics* controlled the result. *Id.* at 148, 771 A.2d 1072. The *Ametek* Court summarized its decision in *Philip Electronics as* follows:

[They] focused on the language of § 9–627(k), that of § 9–628 and § 9–629, § 9–630 being inapplicable, discerning from the language of those sections a clear and unambiguous demonstration of a legislative commitment to the payment of permanent partial disability benefits within a weekly framework, and that such an intent is consistent with the purposes sought to be achieved by the Workers' Compensation Act. Our clear holding was that "any credit for previous payments should . . . be expressed by 'weeks.' "

*Id.* at 149–50 (footnotes and internal citations omitted).

Further, the Court noted that, "[i]n other words, the analysis applicable to cases involving the subsequent reduction of a workers' compensation award [*i.e. Philip Electronics* ] is just as compelling when applied to those cases in which the award has subsequently been increased [*i.e. Ametek* ]." *Id.* at 152.

Despite the recognized benevolent purposes of the Act, and the fact that any uncertainty in the Act itself would be construed in O'Connor's favor, the *Ametek* Court could not disregard the obvious weeks-based framework of the Act. First, there was no danger that O'Connor would go without compensation for the remainder of her increased award term; rather, she would merely not receive increased compensation for the award term that had already passed. *Id.* at 156, 771 A.2d 1072. Second, though the benefit of the *Ametek* Court's decision would rest with the employer, there was no reason that equitable considerations militated otherwise. *Id.* at 157, 771 A.2d 1072. The Court noted that O'Connor, too, "was 'a party to this political equation,' [and received] the valuable benefit of being relieved 'from the vagaries of tort liability.' " *Id.* at 157, 771 A.2d 1072.

Thus, the Court concluded:

Just as predictability and administrative ease are important from the standpoint of the timing of actions, so too are they important in establishing the rules governing the award of

permanent partial disability benefits. It simply will not do to have different rules, depending upon whether it is the claimant or the employer to whom the result is inequitable. *Whether a credit is the amount the employer has paid or for the number of weeks the employer has paid should be determined on some principled and consistent basis and not made to depend upon which of the parties it will benefit.* As the petitioner submits, "The Act should not be interpreted differently depending on the outcome in different claims."[17]

*Id.* at 157, 771 A.2d 1072 (emphasis added).

■ With that predicate in mind, we turn to the case *sub judice.* Although the particular factual scenario presented by the case *sub judice*—benefits increased from Tier 1 to Tier 2 by virtue of a worsening of claimant's condition—has yet to present itself for appellate review, our distillation of the case law reveals three questions that, when answered, characterize each of the above-described holdings construing the Act.

*First: did the claimant initially seek judicial review of the claim, after the Commission's compensation award, through an appeal (e.g. Ametek) or did the claimant reopen the claim due to a worsening of condition under L.E. § 9–736 (e.g. Philip Electronics)?*[18] In the instant case, unlike *Ametek,* we

---

**17.** Another resource characterized the holding in *Ametek* as follows: "Under some authority, after a workers' compensation award of permanent partial disability benefits is increased on judicial review, the employer and insurer are entitled to a credit based on the number of weeks that the benefits were paid, rather than a credit for the actual amount paid." 82 Am.Jur.2d Workers' Compensation § 423 (citing *Ametek, Inc., supra,* 364 Md. 143, 771 A.2d 1072)

**18.** The Manual briefly described the process of each of these mechanisms as follows:

Reopening

The claimant can reopen his claim under L.E. § 9–736(a) within five years from the date of the last compensation paid. The claimant must file with the Commission a request to reopen the claim before the five-year period of limitations applicable to reopening expires, even where the case is pending on appeal and the Commission has no jurisdiction to hear the case until the appeal is concluded. In the

are dealing with an increase that occurred under a reopening due to a progressive worsening of condition.

*Second: has there been an increase (e.g. Ametek) or a reduction (e.g. Philip Electronics) in benefits awarded to a claimant?* The answer to this question will determine which party is advocating a weeks-credit, see *Philip Electronics,* or a dollar-credit, see *Ametek.* Given the transient incentives presented by this variable, and given the fact that despite the remedial nature of the Act, the result is not meant to benefit the employee in every circumstance. The Court of Appeals' decision in *Ametek* makes clear that a determination of this question is immaterial to whether a weeks-credit is to be awarded. Thus, an equity argument is not determinative of the result.

*Third: if the case involves an increase in benefits, was the increase to Tier 2 or Tier 3?* As noted, appellant's argument centers on the fact that in the case *sub judice,* unlike *Ametek,* the increase in compensation placed the ultimate award at a Tier 2 level rather than a Tier 3 level.

Through the lens of these questions, we see that appellant presents a factual scenario that differs, in two ways, from the Court of Appeals most recent pronouncement in *Ametek.* First, the *Ametek* Court addressed a modification of an award following an appeal to the circuit court, rather than a modification predicated upon a reopening. Second, *Ametek* involved an increase of benefits to Tier 3 rather than Tier 2. Appellant

---

event that the Commission does reopen the case, its second decision, regardless of whether it is the same as or different from its previous decision, is appealable.

Appeals

Workers' compensation appeals are governed by L.E. §§ 9–737 to 9–750 and by Md. Rules 7–201 to 7–210, which are applicable to appeals from administrative agencies. An appealable order of the Commission is one which determines the issues and facts necessary to resolve the problem presented in the particular proceeding and which grants or denies some benefit under the Workers' Compensation Act. An appeal must be filed within 30 days from the date of the Commission's order.

(Internal citations omitted).

makes a vigorous argument that L.E. § 9–630(d), providing for a weeks-credit upon a reopening modification to a Tier 3 level, does not apply to his case. As appellee notes, however, L.E. § 9–630(d) was not discussed by the Court of Appeals in *Ametek*. In fact, this omission occurred for good reason, for L.E. § 9–630(d) explicitly applies to petitions to reopen, not appeals.[19] Thus, it is safe to say that on this discrete point, *Ametek* envelopes appellant's argument.

Appellant's argument continues, however, that the absence of similar language in L.E. § 9–629 to that in to L.E. § 9–630(d) indicates a legislative intent to treat benefits rising from Tier 1 to Tier 2 differently than benefits rising from Tier 1 or Tier 2 to Tier 3. That argument poses the question of whether it would be logical to treat a petition to reopen an award, due to an aggravation of condition, and resulting in a lesser benefit, more favorably than an appeal of an initial determination of a condition, resulting in a greater benefit. We believe that such a result would be illogical.

As noted in *Ametek*, applicable provisions of the Act are framed in a weeks format. Appellant's reasoning would have us apply a dollar-credit format in, essentially, only one situation, a petition to reopen a compensation award resulting in Tier 2 benefits.

For the reasons noted by the Court of Appeals in *Ametek*, we cannot embrace such inconsistency in interpreting the Act. Thus, we hold that the circuit court was correct in finding that the County was entitled to a credit for the number of weeks paid to appellant, rather than the amount of dollars paid to appellant.

---

**19.** L.E. § 9–633, effective Oct. 1, 2001, provides:

> If an award of permanent partial disability compensation is reversed or modified by a court on appeal, the payment of any new compensation awarded shall be:
> (1) subject to a credit for compensation previously awarded and paid; and
> (2) otherwise made in accordance with this Part IV of this subtitle.

## Discerning Legislative Intent

In his reply brief, appellant raises issues of legislative intent and argues that the County's weeks-credit position, as adopted by the trial court, is inconsistent with the intent of the General Assembly.

Sound principles of statutory construction have been set forth by our Court many times. In *Johnson, supra,* 156 Md.App. at 592–95, 847 A.2d 1190, Judge Hollander noted the following canons of statutory construction, within the specific context of the Act, citing numerous cases for each proposition:

The seminal tenet of statutory construction compels us to ascertain and effectuate the legislative intent.

The interpretation of a statute is a judicial function. The statutory text is our starting point. Generally, we give the words of the statute their "ordinary and common meaning within the context in which they are used." In other words, to determine the ordinary meaning of a term or word used in a statute, "it is imperative" that we consider "the context." To achieve that objective, we must incorporate "the overall purpose of the statute into its interpretation."

When the statutory language is "clear on its face and in its context, then we do not ordinarily need to turn to the Legislative history." In contrast, when the statute is ambiguous, we ordinarily consider the language "in light of the . . . objectives and purpose of the enactment." In this regard, "we may . . . consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain."

To the extent "reasonably possible," we read a statute so "that no word, phrase, clause, or sentence is rendered surplusage or meaningless." Moreover, when the statute is part of a general statutory scheme or system, " 'all sections must be read together . . . to discern the true intent of the legislature.' " Therefore, we must not examine the provisions of the statute as if they are "isolated, independent sections."

In our effort to effectuate the Legislature's intent, we may consider " 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' " Moreover, "absurd results in the interpretive analysis of a statute are to be shunned."

As we consider the statutory scheme and the specific provisions that are at issue here, we are mindful of the broad social and remedial purposes that undergird the Act. We also take note of the legislative directive that "[t]he title shall be construed to carry out its general purpose." L.E. § 9–102(a). Therefore, it must "be construed as liberally as possible in order to comply with the legislative command, contained in § 9–102(a) . . . . " Moreover, in regard to workers' compensation cases, the Legislature has expressly rendered inapplicable the general rule that "a statute in derogation of the common law is to be strictly construed . . . . " L.E. § 9–102(b).

Because the Act's "core values . . . have never been abandoned," the "benevolent objective of workers' compensation statutes is the polar principle in determining the rights of the parties." Indeed, the Act's provisions are liberally construed in favor of claimants in order to effectuate its benevolent purposes. Consequently, ambiguities or uncertainties in the Act are generally resolved in favor of a claimant.

Nevertheless, regardless of our sympathies, we may not "stifle the plain meaning of the Act, or exceed its purposes, [just] so that the injured worker may prevail." This means that we may not create "ambiguity or uncertainty in the Act's provision where none exists so that a provision may be interpreted in favor of the . . . claimant." Simply put, we may not add or delete words so as " 'to give the statute a meaning not otherwise communicated by the language used.' " Nor may we extend coverage "beyond that which is authorized by the provisions of the Act." [S]ee *Engel & Engel v. Ingerman*, 353 Md. 43, 55, 724 A.2d 645 (1999)

(discussing attorneys' fees in workers' compensation cases and stating that when " 'the language of the statute is plain and clear and expresses a meaning consistent with the statute's apparent purpose, no further analysis is ordinarily required.' ") (Citation omitted).

Moreover, we cannot ignore that the Act " 'reflects the Legislature's considered judgment as to the appropriate allocation of resources between employers, employees, and the taxpayers of this State.' " Although the Act is "remedial in nature," and " 'should be construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes,' " it is equally true that "the Act has a purpose broader than serving the interests of employers and their employees ... The needs and expectations of society, in addition to those of the work force, come into play."

(Some internal citations omitted).

Appellant calls our attention to two recently introduced legislative amendments in further support of his argument that the legislature intended to treat increases to Tier 2 benefits differently than increases to Tier 3 benefits. In the 2005 legislative session, bills were introduced in the House of Delegates and the Senate to amend L.E. § 9–629 by adding language similar to that now contained in L.E. § 9–630(d). If enacted, proposed House Bill 635 and proposed Senate Bill 828 would have combined to cause L.E. § 9–629 to read as follows: [20]

(A) If a covered employee is awarded compensation for a period equal to or greater than 75 weeks but less than 250 weeks, the employer or its insurer shall pay the covered employee weekly compensation that equals two-thirds of the average weekly wage of the covered employee but does not exceed one-third of the State average weekly wage.

(B) *If a covered employee receives additional compensation for a disability on a petition to reopen a claim, the addi-*

---

**20.** Proposed HB 635 and SB 828 contained identical language.

*tional compensation may not increase the amount of compensation previously awarded and paid.*

H.B. 635, 2005 Leg., 420 Sess. (Md.2005); S.B. 828, 2005 Leg., 420 Sess. (Md.2005) (emphasis added). Further, the proposed legislation stated that the express purpose of both bills was, in part,

> for the purpose of providing that if a covered employee receives additional compensation for a disability on a petition to reopen a certain claim, the additional compensation may not increase the amount of compensation previously awarded and paid.

*Id.*

Appellant also points to a fiscal and policy note ("fiscal note") accompanying each of the two proposed bills. The analysis section of the fiscal note indicated the legislative intent of existing law to provide a dollar-credit to the employer when a claim is increased to Tier 2 and a weeks-credit when a claim is increased to Tier 3.[21] The analysis in the fiscal note stated:

---

**21.** This view was also presented in the following passage of the Manual:
Reopening for additional compensation for permanent partial disability
 a. Awards of less than 250 weeks of compensation
 If an employee who has previously received an award of less than 75 weeks reopens the claim and receives an award of more than 75 weeks but less than 250 weeks, he or she is entitled to receive the higher rate of compensation for the total number of weeks, including those weeks covered by the original award.
 b. Awards of 250 weeks or more (serious disability)
 Where an employee has already received an award for compensation of less than 250 weeks and his or her condition then worsens so that the employee is now entitled to compensation for 250 weeks or more, the Commission, upon reopening the claim, may issue an award for serious disability benefits. However, since under L.E. § 9–630(c) [now L.E. § 9–630(d)?] the Commission is not permitted to increase the amount of compensation previously awarded and actually paid, the benefits for serious disability are limited to only those weeks of compensation that remain unpaid as of the date of second award.
*Manual, supra,* at 24.
Notably, for the purposes of our discussion, in support of the first proposition, the Manual cited only our decisions in *Tierney, supra,* 132

## Analysis

**Current Law:** The Workers' Compensation Commission (WCC) may modify any finding or order it considers justified. WCC can only modify an award if applied for within five years after the latter of:

- the date of the accident;
- the date of the disablement; or
- the last compensation payment.

If an employee is awarded compensation for a period between 75 and 249 weeks, the employee receives compensation equal to two-thirds of their average weekly wage not to exceed one-third of the State average weekly wage (currently $786.00).

For compensation for 250 weeks or more, if a covered employee receives additional compensation on a petition to *5 reopen, the additional compensation may not increase the amount of compensation previously awarded and paid.

**Background:** PPD awards can be placed in three tiers, depending on the duration of the award. Permanent partial injuries for which durations of disability are determined to be:

- 75 weeks or less are eligible for first tier benefits (33⅓% rate of compensation; minimum weekly benefit-$50; maximum weekly benefit = $114);
- at least 75 weeks but less than 250 weeks are eligible for second tier benefits (66⅔% rate of compensation; minimum weekly benefit = $50; maximum weekly benefit = $250.61); or
- over 250 weeks are eligible for third tier benefits (66⅔% rate of compensation; 33⅓% additional weeks; $50 minimum weekly benefit; maximum weekly benefit = $563.93).

*The bill would prevent a claimant from receiving an increased award for amounts previously received (i.e., origi-*

Md.App. 149, 751 A.2d 35 and *Norris, supra,* 86 Md.App. 508, 587 A.2d 557 for support.

*nal award) when a PPD claim in the first tier moves to the second tier upon reopening. Since in the first tier the weekly benefit is smaller, this would prevent a retroactive payment reflecting a higher benefit for the time period covered by the original award. The new payments would be at the higher rate.*

Fiscal and Policy Note, H.B. 635 & S.B. 828, 420 Sess., Workers' Compensation—Permanent Partial Disability—Petition to Reopen at 1–2 (Md.2005).

 A close examination of the proposed amendments leads to the conclusion that the intent of the Legislature was to reflect, and thus remedy, this Court's *pre-Ametek* interpretation of the Act. "[T]he Legislature is presumed to be aware of the interpretation that this Court has placed upon its enactments." *Pack Shack v. Howard County,* 371 Md. 243, 257, 808 A.2d 795 (2002); *see also Simpson v. Consolidated,* 143 Md.App. 606, 626, 795 A.2d 754 (2002); *Prince George's County v. Brown,* 334 Md. 650, 640 A.2d 1142 (1994). "[T]his Court, in *Barr v. Barberry Bros., Inc.,* 99 Md.App. 33, 40, 635 A.2d 64 (1994), noted that 'when substantive changes are made it indicates an intent to change the meaning of that statute.' We also perceive that the opposite, *i.e.,* no substantive change, reflects a legislative intent that the meaning of the statute is *not* meant to be changed." *Chase v. Mayor and City Council of Balt.,* 126 Md.App. 427, 435, 730 A.2d 239 (1999). "While a committee's rejection of an amendment is clearly not an infallible indication of legislative intent, it may help our understanding of overall legislative history." *NCR Corp. v. Comptroller,* 313 Md. 118, 125, 544 A.2d 764 (1988) (citing *Demory Brothers v. Bd. of Pub. Works,* 273 Md. 320, 325–26, 329 A.2d 674 (1974)).

Furthermore, the Court of Appeals has also noted that "the fact that a bill on a specific subject fails of passage in the General Assembly is a rather weak reed upon which to lean in ascertaining legislative intent." *Auto. Trade Ass'n v. Ins. Comm'r,* 292 Md. 15, 24, 437 A.2d 199 (1981). The Court of Appeals, in fact, "has 'never held that the amendment-rejec-

tion theory is a completely determinative method of ascertaining legislative intent [they] have indicated that such action strengthens the conclusion that the Legislature did not intend to achieve the results the amendment would have achieved, if adopted' " *Prince George's County v. St. Comm'n*, 40 Md.App. 473, 489, 392 A.2d 105 (1978). In *Plein v. Department of Labor*, 369 Md. 421, 433–34, 800 A.2d 757 (2002), Chief Judge Bell noted that

> the Legislature has shown itself quite capable, and willing, to act decisively and swiftly when the Court does not accurately discern its intent or when it believes the Court has gotten it wrong. *See, e.g.*, 1995 Md. Laws 248, overruling, at the next legislative session, the effects of our decision in *Tandra S. v. Tyrone W.*, 336 Md. 303, 315, 648 A.2d 439 (1994); *see also Langston v. Riffe*, 359 Md. 396, 405, 754 A.2d 389 (2000). Accordingly, the Legislature's inaction, to the same extent to which it acts to effect a change in a statute that this Court recently has interpreted, in the process mischaracterizing the Legislature's intent, must be considered in that light.

The final word on the subject is found in the opinion of the Court of Appeals in *Ametek*, not in an attempt to discern legislative intent from the failure of H.B. 635 and S.B. 828 in the 2005 regular session of the General Assembly.

Accordingly, we affirm the judgment of the circuit court granting credits to appellee on a weeks, rather than dollars paid, basis.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED; COSTS ASSESSED TO APPELLANT.**