946 A.2d 1

**Brian MILLER**

v.

**BALTIMORE COUNTY POLICE DEPARTMENT.**

No. 343, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Feb. 29, 2008.

Reconsideration Denied May 9, 2008.

Michael Marshall (Schlachman, Belsky & Weiner, on the brief), Baltimore, for appellant.

Deborah M. Herman (Gregory R. Rothwell, John E. Beverungen, Baltimore County Attorney, on the brief), Towson, for appellee.

Panel: JAMES R. EYLER, ADKINS and BARBERA, JJ.

JAMES R. EYLER, J.

This case arises from the dismissal of a "complaint and petition to show cause" filed in the Circuit Court for Baltimore County by Brian Miller, appellant, a corporal in the Baltimore County Police Department, appellee. During the course of an internal investigation of appellant concerning a charge that appellant had disobeyed the lawful order of his superior officer, appellee subpoenaed appellant's personal cell phone records from the service provider and used the contents of the cell phone records as evidence in its investigation and interrogation of appellant. The investigation resulted in disciplinary action against appellant.

After learning that his phone records had been subpoenaed, appellant filed a complaint and petition to show cause against appellee, alleging that appellee's issuance of the subpoenas violated appellant's rights under the Law Enforcement Officers' Bill of Rights ("LEOBR"), Maryland Code (2003, 2007 Supp.) § 3–101, *et seq.*, of the Public Safety Article ("P.S."). The circuit court held that the subpoenas were validly issued by appellee under authority granted by the LEOBR and dismissed appellant's complaint and petition to show cause.

On appeal, appellant raises the sole issue of whether the circuit court erred in dismissing his complaint and petition to show cause. Based on our conclusion that appellee did not have the power to issue subpoenas during the course of an

investigation of an internal disciplinary matter, and prior to charging a violation, we shall reverse.

## Factual Background

Appellant is a police officer employed by appellee. In the spring of 2006, an internal investigation of appellant was initiated, regarding an incident that occurred on March 27, 2006. As a result of the internal investigation, disciplinary action was taken against appellant for disobeying a lawful order of his superior officer. The disciplinary action was recorded in a "reprimand and disciplinary action report," dated February 26, 2007. Disciplined officers, such as appellant, have a right to have the charges reviewed by a hearing board. In that event, the disciplinary action report serves as the charging document. The facts relating to the investigation, as reported in the February 26, 2007 "reprimand and disciplinary action report," are as follows.

On or about December 5, 2005, appellant's superior officer, Lieutenant Kevin Green, consulted appellant about fraternizing with civilians while on duty, instructed appellant that any such conduct by appellant should stop immediately, and that if it did not, appellant would be taken off of the midnight shift. On or about March 27, 2006, while appellant was on duty, Lieutenant Green observed appellant and a female named Joy Wagner meet at a 7–Eleven convenience store located at 8507 Loch Raven Boulevard, Towson, Maryland 21286. Lieutenant Green observed appellant and Ms. Wagner drive their respective vehicles to the rear of the Silaom Church located at 8513 Loch Raven Boulevard, Towson, Maryland 21286. Lieutenant Green observed appellant's patrol car in the parking lot behind the church and approached appellant and Ms. Wagner. Lieutenant Green observed appellant leaning into a dark colored sport utility vehicle that was occupied by a "white female with blond hair;" both appellant and the white female were smiling and giggling; and as Lieutenant Green approached the two subjects, appellant appeared surprised and apprehensive.

During the course of the internal investigation, appellee issued subpoenas in order to retrieve appellant's personal cell phone records from Cellco Partnership DBA Verizon Wireless ("Verizon"). The first subpoena was served on Verizon, by facsimile, on May 9, 2006, and contained what purported to be the signature of Major John Krach, as "Hearing Board Chairman." The first subpoena ordered production of the records of incoming and outgoing calls for appellant's cell phone between January 1, 2006 and March 28, 2006. The second subpoena was served on Verizon, by facsimile, on July 25, 2006, and contained what purported to be the signature of Major Joseph E. Burris, as "Hearing Board Chairman." The second subpoena ordered production of the records of incoming and outgoing calls for appellant's cell phone between July 1, 2006 and July 24, 2006. Both subpoenas expressly purported to have been issued under the authority of P.S. § 3–107(d)(1), and both stated that failure to obey the subpoena "may result in a finding of contempt of court by the Circuit Court of Baltimore County." Verizon complied with the subpoenas without complaint and produced appellant's cell phone records.

On October 11, 2006, appellant was notified that he was under investigation regarding the March 27, 2006 incident. On October 18, 2006, appellee's representative interviewed and questioned appellant about Lieutenant Green's sighting of appellant at the 7–Eleven and Silaom Church on March 27, 2006, and about the cell phone records. This is when appellant first learned that his cell phone records had been subpoenaed.

On February 26, 2007, appellant's precinct commander, in a reprimand and disciplinary action report, notified appellant of a disciplinary violation, to wit, disobeying the lawful order of a superior officer on March 27, 2006, by fraternizing with Ms. Wagner while on duty. The reprimand and disciplinary action report, signed by the precinct commander, stated that appellant's personal cell phone records revealed that appellant and Ms. Wagner had had a series of telephone conversations prior to their March 27, 2006 meeting at the 7–Eleven. The report

stated that the record of these telephone conversations indicated that the meeting "was not coincidental," as appellant had purportedly asserted during questioning following the incident, and that the phone records corroborated Lieutenant Green's allegation that appellant, while on duty, was fraternizing with a civilian.

On March 28, 2007, appellant requested that the matter be reviewed by a hearing board.

On November 28, 2006, after the issuance of the subpoenas and prior to notification to appellant of disciplinary action, appellant filed a complaint and petition to show cause in circuit court, alleging that appellee had violated appellant's rights under the LEOBR because appellee did not have authority to issue subpoenas during its internal investigation of the March 27, 2006 incident. Appellant sought an order requiring appellee to return the originals and all copies of documents that appellee received from the issued subpoenas, that appellee be precluded from using any information obtained from the subpoenas, and that any questions asked in reference to the phone records in interviews with appellant be stricken from the investigation. The complaint was filed pursuant to P.S. § 3–105, which permits law enforcement officers who are denied rights under the LEOBR to file in circuit court a petition for an order directing the law enforcement agency to show cause why the rights should not be granted.

On December 4, 2006, the circuit court ordered appellee to show cause on or before December 27, 2006 why appellant's requested relief should not be granted. On December 19, 2006, appellee filed a response to appellant's complaint and petition to show cause.

On April 9, 2007, the circuit court issued a memorandum opinion and order dismissing appellant's complaint and petition to show cause. In its memorandum opinion, the circuit court noted that P.S. § 3–104 does not place any restrictions on the method of investigation, and then held:

[T]he statutory scheme [under the LEOBR] allows for a law enforcement agency to investigate and discipline "errant"

officers, and [the law enforcement agency] should have available to it the standard investigatory techniques, including the authority to subpoena, to be able to verify and track the movements, locations and activities of officers by the use of cell phone records.

Appellant then appealed to this Court.[1]

## Discussion

The issue before us is whether appellee had the power to issue two subpoenas to Verizon to produce appellant's personal cell phone records during its internal investigation of appellant and prior to placing charges against him. Appellant contends that appellee did not have the power to issue subpoenas, and that in issuing the subpoenas and using the cell phone records during its interrogation of appellant, appellee violated appellant's rights under the LEOBR. Appellee disagrees and contends the subpoenas were validly issued under the LEOBR and appellant's rights under the LEOBR were not violated.

### I. *Police Department's Power to Issue Subpoenas*

It is generally recognized that courts and legislatures have inherent power to compel the production of witnesses for the purpose of testifying and the production of documents, subject to current laws, rules and regulations regulating that power. *See Green v. United States,* 356 U.S. 165, 169–70, 78 S.Ct. 632, 2 L.Ed.2d 672 (1958) (explaining that at English common law, disobedience of a writ under the King's seal was treated as a contempt, that English courts used the King's seal to enforce their own process, and that under the Judiciary Act of 1789 federal courts were granted those powers possessed at common law by English courts), *overruled on other grounds by Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); *Pearson v. State,* 28 Md.App. 464, 480, 347 A.2d 239 (1975) (explaining that Maryland Code (2006 Repl.Vol., 2007

---

**1.** As noted above, appellant requested review by a hearing board. At oral argument, we were advised that the administrative proceedings have been stayed; thus, the hearing has not been held.

Supp.) § 1–202(a) of the Courts & Judicial Proceedings Article "recognizes the inherent power of a court to punish for contempt and to compel compliance with its commands" and that such power must be exercised in compliance with the Maryland Rules). *See also Quinn v. United States,* 349 U.S. 155, 161, 75 S.Ct. 668, 99 L.Ed. 964 (1955) (defining the limitations on U.S. Congressional powers to compel information, explaining "[i]t cannot be used to inquire into private affairs unrelated to a valid legislative purpose. Nor does it extend to an area in which Congress is forbidden to legislate." (footnote omitted)).

With respect to the power of courts to compel testimonial information, Wigmore on Evidence explains:

> Inherently and primarily, the power belongs to the judiciary, because the application of the law to the facts in litigation requires a finding of the facts, and the finding cannot be made without investigation, and the necessity of investigation imports the power to compel answers and make disclosures of every sort.

> The power of the judiciary is frequently described in a statute or court rule, but no question of inherent power can ordinarily arise.

8 Wigmore on Evidence § 2195, at 78 (McNaughton rev.,1961); *see also Brown v. United States,* 359 U.S. 41, 50–51, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959) (holding district court's sentence of 15 months imprisonment for contempt for failure to make disclosures to federal grand jury was not an abuse of discretion, and explaining Rule 42 of the Federal Rules of Criminal Procedure authorizing punishment for contempt was "no innovation" and "simply makes 'more explicit' the long-settled usages of law ...."), *overruled on other grounds by Harris v. United States,* 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965).

With respect to the power of legislatures to compel testimonial information, Wigmore explains:

> In actual legislative practice, power to secure needed information by such means has long been treated as an attribute

of the power to legislate. It was so regarded in the British Parliament and in the Colonial Legislatures before the American Revolution, and a like view has prevailed and been carried into effect in both Houses of Congress and in most of the State Legislatures....

We must assume, for present purposes, that neither House will be disposed to exert the power beyond its proper bounds, or without due regard to the rights of witnesses. But if, contrary to this assumption, controlling limitations or restrictions are disregarded.... [A] witness rightfully may refuse to answer where the bounds of the power are exceeded or the questions are not pertinent to the matter under inquiry.

Wigmore on Evidence § 2195, at 83–84 (quoting *McGrain v. Daugherty,* 273 U.S. 135, 161, 175–76, 47 S.Ct. 319, 71 L.Ed. 580 (1927)); *see also Quinn,* 349 U.S. at 160–61, 75 S.Ct. 668 (explaining "[t]here can be no doubt as to the power of Congress ... to investigate matters and conditions relating to contemplated legislation," and that "[w]ithout the power to investigate-including of course the authority to compel testimony, ... Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively.")

With respect to executive power to compel testimonial information, Wigmore explains:

That the executive of the state has a limited inherent power, comparable to that of the legislature, to employ testimonial compulsion for aiding the executive purposes, ought not to be doubted. But the exercise of the power has rarely been attempted, and the legitimate scope of its inquiries would be difficult to define.

Wigmore on Evidence § 2195, at 87. There are no reported cases in Maryland recognizing the executive branch's inherent power to compel testimonial information.

■ Administrative agencies, in Maryland, have power to subpoena information but only through the express statutory grant of such power by the General Assembly. *See Banach v.*

*State of Md. Comm'n on Human Relations,* 277 Md. 502, 506, 356 A.2d 242 (1976) (defining a threefold test for determining the validity of a subpoena issued by an administrative agency; the first step being that the inquiry is authorized by statute); *see also State of Md. Comm'n on Human Relations v. Balt. County,* 46 Md.App. 45, 52–54, 415 A.2d 856 (1980) (applying the *Banach* threefold test for determining the validity of an administrative subpoena and analyzing whether an agency's investigative inquiry was authorized by statute).

In Maryland, generally speaking, there are two types of agencies that have been granted broad statutory subpoena power: (1) regulatory commissions and boards that regulate for the public good, including but certainly not limited to the Maryland Commission on Human Relations, the Maryland Home Improvement Commission, and boards that regulate professions; and (2) State agencies delegated with multiple responsibilities of regulation, licensing, and administration of programs, including but certainly not limited to the Department of Health and Mental Hygiene and the Department of Labor, Licensing and Regulation. These two types of agencies are typically granted subpoena power that expressly extends to investigations of matters relevant to the duties of the agency. *See, e.g., Banach,* 277 Md. at 512–13, 356 A.2d 242 (holding Maryland Commission on Human Relations possesses statutory authority to issue a subpoena *duces tecum* in connection with preliminary investigations regarding complaints of discriminatory practices in employment); *Dr. K v. State Bd. of Physician Quality Assurance,* 98 Md.App. 103, 109, 111 n. 3, 632 A.2d 453 (1993) (explaining the investigatory power of the State Board of Physician Quality Assurance under Maryland Code (1957, 1991 Repl.Vol., 1993 Supp.) § 14–401, *et seq.,* of the Health Occupations Article, which includes the power to issue subpoenas during investigations).

A police department does not have inherent subpoena power, either in the context of civil investigations, such as employee disciplinary matters, or criminal investigations. *See generally* Sara Sun Beale et al., *Grand Jury Law and Prac-*

*tice* § 6:1, at 6–3 (2d. ed.2005) (explaining that in "most jurisdictions, police investigations are conducted without the benefit of the subpoena power," and noting that "the absence of that authority does not significantly impair the effectiveness of the investigation" for crimes such as murder, rape, robbery, and assault).[2]

This case does not involve a regulatory commission or board regulating for the public good, or an agency delegated multiple responsibilities to administer a government program. Instead, this case concerns an employer-employee disciplinary action within a police department. While we have not conducted an extensive search, the grant of statutory subpoena power, to any agency, for the purpose of conducting an investigation in the context of an employee disciplinary matter is much less apparent than in the situations described above.

Having found no basis for any subpoena power in appellee in the context of investigating an employee disciplinary matter, aside from a statutory grant of such power, and, after review, having found no statutory grant outside the LEOBR, our analysis of appellee's power to issue subpoenas depends on our interpretation of the LEOBR.

## II.   *The Law Enforcement Officers' Bill of Rights*

Maryland's Law Enforcement Officers' Bill of Rights (LEOBR) was enacted with the purpose "to guarantee that police officers are afforded certain procedural safeguards during any investigation and subsequent hearing which could result in disciplinary action." *Fraternal Order of Police v. Mehrling*, 343 Md. 155, 181, 680 A.2d 1052 (1996); *see also Moats v. City of Hagerstown*, 324 Md. 519, 526, 597 A.2d 972 (1991) ("The language and history of the Law Enforcement

---

2.   Most commentaries on the topic of the criminal investigatory process distinguish between the police power of search and custodial interrogation, and the prosecutor's power to subpoena witnesses before a grand jury. *See, e.g.,* William J. Stuntz, *O.J. Simpson, Bill Clinton, and the Trans substantive Fourth Amendment,* 114 Harv. L.Rev. 842, 857–58 (2001); Kenneth Mann, *Punitive Civil Sanctions: The Middleground Between Criminal and Civil Law,* 101 Yale L.J. 1795, 1810–11 (1992).

Officers' Bill of Rights demonstrates an intent to establish an exclusive procedural remedy for a police officer in departmental disciplinary matters."). The law was enacted in 1974, several years after two Supreme Court cases, *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), and *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), provided law enforcement officers with procedural protections under the Fifth Amendment privilege against self-incrimination and the Fourteenth Amendment due process clause of the U.S. Constitution. *See Garrity*, 385 U.S. at 497–98, 87 S.Ct. 616 (holding that when police officers under investigation were given the choice either to incriminate themselves or to forfeit their jobs for refusing to incriminate themselves, and officers chose to make confessions, the confessions were coerced, and the Fourteenth Amendment due process clause prohibited their use in subsequent criminal proceedings); *Gardner*, 392 U.S. at 278–79, 88 S.Ct. 1913 (holding New York city statute providing for discharge of police officers who refused to waive immunity from prosecution violated the Fifth Amendment privilege against self-incrimination, made applicable to the states through the Fourteenth Amendment due process clause, and a police officer could not be discharged for refusing to waive immunity when he appeared before the grand jury investigating conduct of police officers).

Following *Garrity* and *Gardner*, and in light of continuing abuses of police officers' privilege against self incrimination, members of Congress, between 1970 and 1977, unsuccessfully attempted to enact a federal law enforcement officers' bill of rights. *See* Byron L. Warnken, *The Law Enforcement Officers' Privilege Against Compelled Self–Incrimination*, 16 U. Balt. L.Rev. 452, 458 (1987). The unsuccessful attempts served as an impetus for state statutes providing law enforcement officers' bills of rights, however, and in 1974, Maryland became the first state to enact such a law. *Id.* at 458, 492.

### Subpoena Powers under the LEOBR

The threefold test for determining the validity of a subpoena issued by an administrative agency is: "Whether the

inquiry is authorized by statute, the information sought is relevant to the inquiry, and the demand is not too indefinite or overbroad." *Banach,* 277 Md. at 506, 356 A.2d 242 (citing *Okla. Press Publ'g Co. v. Walling,* 327 U.S. 186, 208, 66 S.Ct. 494, 90 L.Ed. 614 (1946)). The issue in this case requires analysis of the first step only, whether the provisions of the LEOBR authorized appellee to subpoena appellant's cell phone records during its preliminary investigation of the March 27, 2006 incident and prior to the filing of a charge of a disciplinary violation against appellant.

The basic principles of statutory construction, in the context of the LEOBR, were stated succinctly by the Court of Appeals in *Blondell v. Baltimore City Police Department*:

> In construing the LEOBR provisions at issue in this case, we apply the paradigm of statutory construction developed in numerous decisions of this Court. As we have often stated, the cardinal rule of statutory construction is to ascertain and effectuate the legislative intention. The primary indicator of the Legislature's intent is the language of the statute. We interpret statutes to give every word effect, avoiding constructions that render any portion of the language superfluous or redundant. In addition, we construe the statute as a whole, interpreting each provision of the statute in the context of the entire statutory scheme. If the statutory language, read in its entirety, is clear and unambiguous, and comports with the Legislature's purpose, we need not inquire further to discern the statute's meaning.

341 Md. 680, 690–91, 672 A.2d 639 (1996) (internal quotations and citations omitted).

Appellant contends that P.S. § 3–104 (relating to the investigation of a law enforcement officer) does not grant subpoena power, and the fact that subpoena power is expressly granted in a different provision of the statute, P.S. § 3–107 (relating to a hearing before a hearing board), is an indication of the General Assembly's intent to not grant subpoena power for purposes of the pre-charge investigation. In reply, appellee

contends that P.S. § 3–104 contemplates a thorough investigation, that subpoena power is implicit in the process of investigation, and therefore, subpoena power should be implied under P.S. § 3–104. Additionally, appellee contends that the language of P.S. § 3–107 should be read to mean that subpoena power granted to the hearing board extends to the pre-charge investigation. Thus, the question presented is two-fold: first, whether there is an implied grant of subpoena power under P.S. § 3–104 during the pre-charge investigation of police officers, and second, whether the subpoena power expressly granted to the hearing board under P.S. § 3–107 extends to the pre-charge investigation.

First, looking at the language of the LEOBR, P.S. § 3–104 sets forth an extensive statutory scheme governing the conduct of investigations and interrogations of police officers. P.S. § 3–104(b) determines who the investigating or interrogating officer shall be; subsection (c) sets forth the requirements of a complaint in which police brutality is alleged; subsection (d) provides notice requirements and identifies certain disclosures that must be made to an officer under investigation; subsection (e) identifies certain disclosures that must be made to officers under arrest; subsection (f) provides for the time of day that an interrogation shall be conducted; subsection (g) provides the location of the interrogation; subsection (h) provides how the interrogation shall be conducted, including how many interrogating officers may ask questions during interrogation, and the length of interrogations; subsection (i) prohibits threats of transfer, dismissal, or disciplinary action against an officer under interrogation; subsection (j) provides that an officer under interrogation has a right to have counsel or another representative present during interrogation, and the officer's counsel or representative has a right to note objections during the interrogation; subsection (k) provides that a complete record shall be kept of the entire interrogation; subsection (*l*) provides the police department may order the officer under investigation to submit to blood alcohol tests, blood, breath, and urine tests for controlled dangerous substances, and polygraph examinations; subsec-

tion (m) provides that the results of a polygraph examination shall not be used as evidence in an administrative hearing, unless both the police department and the officer under investigation agree to admission; subsection (n) provides the officer under investigation shall be notified of the name of each witness and each charge against the officer, and that the officer shall be provided with the investigatory file upon execution of a confidentiality agreement between the police department and the officer, and payment of any reprinting costs by the officer; and subsection (o) prohibits the placement of adverse material into a file of the officer under investigation. *See* P.S. § 3-104(b)-(o). Throughout P.S. § 3-104, the terms "interrogation" or "investigation" are used, and § 3-104(b) refers to "interrogating" or "investigating" officers.

Although P.S. § 3-104 recognizes substantial intrusive rights by a police department during the course of an investigation, such as interrogation and testing of blood alcohol, blood, breath, urine, and polygraph examination, it is silent regarding the department's subpoena power.

P.S. § 3-107(a)(1) provides, in pertinent part:

[I]f the investigation or interrogation of a law enforcement officer results in a recommendation of demotion, dismissal, transfer, loss of pay, reassignment, or similar action that is considered punitive, the law enforcement officer is entitled to a hearing on the issues by a hearing board before the law enforcement agency takes that action.

P.S. § 3-107(b) requires that the officer under investigation receive notice of his right to a hearing. Subsection (c) sets forth the requirements of membership on a hearing board, requiring at least three members who are police officers. P.S. § 3-107(c).

Subsection (d) grants the hearing board authority to issue subpoenas, providing: "In connection with a disciplinary hearing, the chief or hearing board may issue subpoenas to compel the attendance and testimony of witnesses and the production of books, papers, records, and documents as relevant or necessary." P.S. § 3-107(d)(1). Under the definitions section

of the LEOBR, "hearing" is defined as "a proceeding during an investigation conducted by a hearing board to take testimony or receive other evidence," and "does not include an interrogation at which no testimony is taken under oath." P.S. § 3–101(c)(1)–(2). "Hearing board" is defined as "a board that is authorized by the chief to hold a hearing on a complaint against a law enforcement officer." P.S. § 3–101(d).

In construing P.S. §§ 3–104 and 3–107, and the definitions of the terms used within those sections, first, we conclude there is no grant of subpoena power under P.S. § 3–104; and second, that the grant of subpoena power to the chief or a hearing board under P.S. § 3–107(d)(1) exists only after a disciplinary violation charge has been filed against an officer, and does not exist with respect to the pre-charge investigation or interrogation.

Our construction of P.S. §§ 3–104 and 3–107 regarding subpoena power is reinforced by other sections of the LEOBR. First, if we were to construe P.S. § 3–104 as providing an implied grant of subpoena power during a pre-charge investigation, this would permit subpoenas to be issued without notice to the officer under investigation. This would be inconsistent with the spirit of other provisions of the LEOBR, which provide substantial notice requirements. For example, P.S. § 3–104(d)(1) provides that an officer under investigation must be notified of the names, ranks, and commands of the officer in charge of the investigation, the officer conducting the interrogation, and each individual present during the interrogation. Section 3–104(d)(2) provides that before an interrogation, an officer must be notified in writing of the nature of the investigation. *See Ocean City Police Dep't v. Marshall,* 158 Md.App. 115, 128, 854 A.2d 299 (2004). P.S. § 3–107(b) requires that an officer receive notice of his right to a hearing by a hearing board.

Additionally, if notice is not provided to the officer under investigation regarding the issuance of subpoenas under P.S. § 3–104, the officer would not have the opportunity to challenge the substantive basis of the subpoena before willing

compliance by a third party. This is inconsistent with P.S. § 3–105, which permits an officer to file a petition in the circuit court for a show cause order challenging the denial of certain rights under the LEOBR. Without notice of the subpoenas issued under P.S. § 3–104, the officers under investigation would not know of any potential denial of rights.

Finally, although P.S. § 3–104 recognizes intrusive rights by a police department to investigate and interrogate officers, P.S. § 3–103(c) protects certain matters from disclosure relating to an officer's property, income, assets, source of income, debts, or personal or domestic expenditures, including those of a member of the officer's family or household. Any implied power to issue subpoenas under P.S. § 3–104 without notice to the officer under investigation could potentially permit invasion into these matters without the officer's knowledge.

Our reading of the subpoena powers provided by P.S. §§ 3–104 and 3–107 is consistent with the other provisions of the LEOBR. P.S. § 3–102(c) provides that the LEOBR "does not limit the authority of the chief [of a law enforcement agency] to regulate the competent and efficient operation and management of a law enforcement agency by any reasonable means[,]" provided the action is not punitive in nature, and the chief determines the action is in the best interests of the agency. Our construction of P.S. §§ 3–104 and 3–107 is in the context of when there has been a charge of a disciplinary violation which constitutes punitive action against an officer and, therefore, does not limit a police department chief in his or her ability to take non-punitive action against an officer.

The remaining provisions of the LEOBR address other aspects of the procedure for taking disciplinary action against police officers. *See* P.S. § 3–108 (provides for disposition of administrative action where action results in a finding of guilty or not guilty by the hearing board; recommendation of a penalty where finding of guilt; requirements for finality of the decision by the hearing board; procedure for review of the findings by the chief of a police department); P.S. § 3–109 (provides for appeal of decision under § 3–108 to the circuit

court; and additional appeal to the Court of Special Appeals); P.S. § 3–110 (provides procedure for expungement of record of a formal complaint against an officer).

These sections of the LEOBR, combined with sections already discussed, delineate several procedural stages for taking disciplinary action against police officers, starting with (1) an initial stage of investigation and interrogation under P.S. § 3–104; (2) the filing of a charge of disciplinary action against an officer, the officer's right to a hearing, the convening of a hearing board, and the hearing board's power to issue subpoenas to compel testimony and other evidence as necessary, under P.S. § 3–107; (3) the disposition of administrative action under P.S. § 3–108; (4) appellate review of the administrative findings under P.S. § 3–109; and (5) subsequent proceedings relating to expungement of the record of a complaint, summary punishment, emergency suspension, and false complaints under P.S. §§ 3–110–113. Our construction of the statute, specifically, that any grant of subpoena power under the LEOBR is limited to proceedings conducted by a hearing board under P.S. § 3–107, after a charge of disciplinary action has been filed against an officer, and not to the pre-charge investigation, is consistent with the procedural stages for taking disciplinary action against police officers, as outlined under the LEOBR.

Appellee contends that the language of P.S. § 3–107(d)(1), that a hearing board may issue subpoenas "[i]n connection with a disciplinary hearing," should be read broadly as providing for subpoena power during a pre-charge investigation and interrogation. Appellee cites *Banach*, 277 Md. 502, 356 A.2d 242, to support its argument and contends that the holding of *Banach* is that the authority to issue a subpoena during an agency investigation prior to a hearing is implicit in the investigatory process. We disagree with appellee's interpretation of § 3–107(d)(1) and with its reading of the holding in *Banach*.

In *Banach*, the Maryland Commission on Human Relations ("Commission") issued a subpoena *duces tecum* directing A.S.

Abell Company ("Abell Company"), then the publisher of the Baltimore Sun newspaper, and its personnel manager, to produce certain employment records in connection with a preliminary investigation then being conducted by the Commission into alleged discriminatory practices. *Banach,* 277 Md. at 503–04, 356 A.2d 242. The preliminary investigation was prompted by several complaints that had been filed with the Commission alleging various discriminatory practices by the Abell Company. *Id.* at 504, 356 A.2d 242.

The statute at issue in *Banach* was Maryland Code (1957, 1972 Repl.Vol.) § 1, *et seq.,* of Article 49B, *see Banach,* 277 Md. at 506, 356 A.2d 242, which established the Maryland Commission on Human Relations, and granted the Commission authority to investigate alleged discriminatory practices in employment, and when such practices are found to exist, to eliminate such practices. *See* Maryland Code (1957, 2003 Repl.Vol., 2007 Supp.) §§ 1, 3, 9A–11 of Article 49B. As outlined in *Banach,* Maryland Code (1957, 1972 Repl.Vol.) § 12(a) of Article 49B (now § 9A(a)), permits any person claiming to be aggrieved by an alleged discriminatory practice to file a complaint with the Commission. Upon the filing of a complaint under § 12(a), Md.Code, Art. 49B, § 12(b) (now § 9A(b)) provides that, after conducting a preliminary investigation, the Commission may, by its own motion, file a complaint. Once the Commission has filed a complaint, Maryland Code (1957, 1972 Repl.Vol.) § 13 of Article 49B (now § 10(a)) provides for further investigation, and if necessary, Maryland Code (1957, 1972 Repl.Vol.) § 14 of Article 49B (now § 11) provides for a hearing on the complaint. *Banach,* 277 Md. at 504–07, 356 A.2d 242. The subsection at issue in *Banach* was Md.Code, Art. 49B, § 14(d), entitled "Power of Commission to administer oaths, etc.; subpoenas," and it provided: "In the administration and enforcement of the provisions of these several subtitles, the Commission has power to administer oaths and to issue subpoenas, to compel the attendance and testimony of witnesses and the production of books, papers, records and documents relevant or necessary for proceedings under the particular subtitle...." *Banach,* 277 Md. at 507,

356 A.2d 242 (quoting Md.Code, Art. 49B, § 14(d) (current version at Maryland Code (1957, 2003 Repl.Vol., 2007 Supp.) § 11(d)(1)(i)-(iii) of Article 49B)) (emphasis removed).

In *Banach*, the subpoena *duces tecum* at issue had been filed during a preliminary investigation of a complaint under § 12(b), and prior to the filing of a complaint by the Commission. *Id.* at 505–06, 356 A.2d 242. The Abell Company contended the Commission's subpoena power under § 14(d) did not extend to a preliminary investigation conducted under § 12(b), and was available only for an investigation conducted pursuant to § 13 or in connection with a hearing under § 14 following the issuance of a formal complaint. *Id.* at 506, 356 A.2d 242. The Court of Appeals disagreed and held that under § 14(d), the Human Relations Commission possessed statutory authority to issue a subpoena *duces tecum* in connection with a preliminary investigation under § 12(b). *Id.* at 512–13, 356 A.2d 242.[3]

---

**3.** In so holding, the Court of Appeals distinguished its interpretation of the statutory language of Md.Code, Art. 49B, § 14(d) from two cases in which courts had held statutory language in similar state anti-discrimination statutes did not grant subpoena power during preliminary investigations of alleged discriminatory practices. *See Banach*, 277 Md. at 510–11, 356 A.2d 242 (discussing *Colo. Civil Rights Comm'n v. Adolph Coors Corp.*, 29 Colo.App. 240, 486 P.2d 43 (1971) and *Pa. Human Relations Comm'n v. U.S. Steel Corp.*, 458 Pa. 559, 325 A.2d 910 (1974)). The Court of Appeals explained that the statutory language of the statutes in both cases "differed markedly from Art. 49B" and that "[n]ot surprisingly, therefore, in view of the statutory language confronting those courts, they concluded in each instance that the subpoena power was not available in the preliminary investigation stage." *Id.* at 510–11, 356 A.2d 242. In a footnote, the Court quoted the statutory language of the Colorado statute considered in *Adolph Coors Corp.*, and added emphasis:

'To hold *hearings* upon any complaint made against . . . an employer, . . . to *subpoena witnesses* and compel their attendance, to administer oaths and take the testimony of any person under oath, and to compel such employer . . . *to produce for examination* any books and papers relating to any matter involved in such complaint. *Such hearings* may be held by the commission itself, or by any commissioner, or by the coordinator, or by any hearing examiner appointed by the commission. If a *witness* either fails or refuses to obey a subpoena issued by the commission, the commission may petition the district court

When interpreting § 14(d), the Court of Appeals added the following emphasis to the provision: "In the *administration and enforcement* of the provisions of *these several subtitles,* the Commission has power to administer oaths and to issue subpoenas, to compel the attendance and testimony of witnesses and the production of books, papers, records and documents relevant or necessary for *proceedings* under the *particular subtitle." Id.* at 507, 356 A.2d 242. The Court noted that the first part of the sentence suggested a distinction between the administrative and enforcement functions of the Commission. *Id.* at 509, 356 A.2d 242. The Court explained that §§ 12–16 of Article 49B were grouped under the "enforcement" subtitle, and that the distinction between "administration and enforcement" in § 14(d) suggested the General Assembly intended to extend the use of subpoenas to areas beyond enforcement investigations and hearings. *Id.* The Court also noted that use of the term "proceedings" in § 14(d), rather than "hearings" was significant, and that "proceedings" was "a term of broad scope, encompassing both the investigative and adjudicative functions of an administrative agency." *Id.* at 509–10, 356 A.2d 242 (citations omitted).

The language of Art. 49B's grant of subpoena power to the Maryland Commission on Human Relations is distinguishable from the language of P.S. § 3–107(d)(1). The language of P.S. § 3–107(d)(1) granting the hearing board power to issue subpoenas is not as broad as the language of § 14(d). Section 14(d), as emphasized by the Court of Appeals in *Banach,* applied to the "several subtitles" of the article, whereas the grant of subpoena power under P.S. § 3–107(d)(1) is limited to compelling witnesses and the production of documents "in connection with a disciplinary hearing." And while § 14(d) uses the term "proceedings," a term defined in *Banach* as encompassing both investigative and adjudicative functions,

having jurisdiction for issuance of a subpoena in the premises ....' (emphasis added).
*Banach,* 277 Md. at 511, n. 5, 356 A.2d 242 (quoting Colo.Rev.Stat. § 80–21–5 (1963) (current version at Colo.Rev.Stat. § 24–34–305(d)(I) (2007))).

P.S. § 3–107(d)(1) uses the term "hearing," and the term is defined under P.S. § 3–101(c)(1)–(2) as "a proceeding during an investigation conducted by a hearing board to take testimony or receive other evidence," but not including "an interrogation at which no testimony is taken under oath."

The Court of Appeals' holding in *Banach,* and another case cited by appellee, *Yellow Freight System, Inc. v. Kansas Commission on Civil Rights,* 214 Kan. 120, 519 P.2d 1092 (1974), indicate that, as a question of statutory interpretation, an agency's subpoena power may extend to its investigatory functions, based upon the legislative intent, the specific statutory language employed, and the nature of the agency and its undertaking. *See Banach,* 277 Md. at 507–513, 356 A.2d 242 (holding subpoena powers provided under Md.Code, Art. 49B, § 14(d) to Maryland Commission on Human Relations extended to preliminary investigations of discriminatory practices prior to filing of complaint of discriminatory practice by Commission, based upon the language of the statute, and the statute's emphasis of the investigatory function of the Commission); *Yellow Freight Sys., Inc.,* 214 Kan. at 122–24, 519 P.2d 1092 (holding subpoena powers granted under Kan. Stat. Ann. § 44–1005 (1971) to Kansas Commission on Civil Rights extended to preliminary investigations of discriminatory practices, not just to the preliminary stages of complaint procedure, based upon the language of the statute, the general purposes of the statute, and the investigative and reporting duties assigned to the Commission under the statute). That is different, however, from stating that the power to subpoena to conduct hearings necessarily includes the power to subpoena to conduct investigations. No such rule can be gleaned from *Banach* or *Yellow Freight System, Inc.*

Finally, we note that our construction of the subpoena power provided under the LEOBR is consistent with the legislative purpose of the statute to provide law enforcement officers with procedural safeguards during investigations and hearings that could result in disciplinary action. *See Mehrling,* 343 Md. at 181, 680 A.2d 1052; *Moats,* 324 Md. at 526,

597 A.2d 972. Appellee's construction of P.S. § 3–107, that the hearing board's subpoena power extends to the pre-charge investigation and interrogation of police officers requires an expansive reading of the language of § 3–107, one that is inconsistent with the legislative purpose of the LEOBR. "In the absence of such express legislative intent, it is not the role of the judiciary to extend by fiat the powers of any administrative body." *Prince George's County v. State of Md. Comm'n on Human Relations,* 40 Md.App. 473, 486, 392 A.2d 105 (1978), *vacating as moot* 285 Md. 205, 401 A.2d 661 (1979).

■ This case is an employer-employee disciplinary matter within a police department. The proceedings under P.S. § 3–107 were established for the purpose of providing police officers with additional procedural protections when disciplinary action is brought against them by a police department. Employers generally do not have subpoena powers to investigate disciplinary matters regarding their employees, and no exception applies when a police department is investigating disciplinary matters regarding its officers.[4]

In conclusion, we hold (1) that P.S. § 3–104 does not grant subpoena power during an investigation or interrogation of police officers regarding disciplinary matters; and, (2) the grant of subpoena power under P.S. § 3–107(d)(1) is limited to the time period after a charge of disciplinary action has been filed against an officer, and not to the pre-charge investigation

---

4. Kentucky, Rhode Island, Virginia, and West Virginia have statutes similar to Maryland's LEOBR, which provide hearing boards to review disciplinary complaints against police officers and grant the hearing boards subpoena power to compel witness testimony and the production of documents at the hearings. *See* Ky.Rev.Stat. Ann. § 15.520(h)(6) (2007); R.I. Gen. Laws § 42–28.6–7 (2007); Va.Code Ann. § 9.1–504(B) (2007); W. Va.Code § 8–14A–3(d)(3) (2007). There are no reported cases by courts within those states, interpreting the provision granting subpoena power to hearing boards and, specifically, whether it extends to pre-complaint investigations and interrogations. For an article discussing law enforcement officers' bills of rights throughout the states generally, *see* Kevin M. Keenan & Samuel Walker, *An Impediment to Police Accountability? An Analysis of Statutory Law Enforcement Officers' Bills of Rights,* 14 B.U. Pub. Int. L.J. 185 (2005).

or interrogation of the officer. Thus, the circuit court erred in its construction of P.S. §§ 3–104 and 3–107, and we reverse.

We now turn to the question of the effect of that conclusion. On appeal, appellant requests that we reverse the decision of the circuit court, preclude appellee from using the telephone records obtained by the subpoenas in the internal investigation, and dismiss the disciplinary charge. In the complaint filed in circuit court, appellant sought an order requiring appellee to return the originals and all copies of documents that were produced in response to the subpoenas, preclude appellee from "using any information obtained therein in any fashion whatsoever" and "any questions asked in reference to the phone records in the interview of [appellant] be stricken from the investigation".

First, we conclude that dismissal of the disciplinary charge is not an appropriate remedy. Appellant did not ask for it in his complaint in circuit court, but even if he had, dismissal would not be appropriate. The reprimand and disciplinary action report, which serves as the charging document, indicates that the charge was primarily based on Lieutenant Green's observations on the day of the alleged incident and on appellant's responses during his interrogation. The phone records were referenced as corroborating information.

The phone records and appellant's responses in interrogation, to the extent based on the phone records, cannot serve as a basis for the charge. The administrative process will determine, in the first instance, whether the resultant charge is sustainable. Additionally, as long as applicable provisions in the LEOBR relating to notice and disclosure are complied with, we are not aware of any law that would prevent using the records obtained by unauthorized subpoenas as evidence in a hearing before a hearing board. While the result may turn out to be a Pyrrhic victory for appellant, there is no general exclusionary rule under State law, based on unlawful obtention of evidence. *See Thompson v. State,* 395 Md. 240, 259, 909 A.2d 1035 (2006); *Fitzgerald v. State,* 153 Md.App. 601, 682 n. 4, 837 A.2d 989 (2003).

JUDGMENT REVERSED. COSTS TO BE PAID BY APPELLEE.